BURNS *v.* REED

No. 89–1715.   Argued November 28, 1990—Decided May 30, 1991

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, KENNEDY, and SOUTER, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment in part and dissenting in part, in which BLACKMUN, J., joined, and in Part III of which MARSHALL, J., joined, *post*, p. 496.

*Michael K. Sutherlin* argued the cause and filed a brief for petitioner.

*Robert S. Spear* argued the cause for respondent. With him on the brief were *Linley E. Pearson*, Attorney General of Indiana, and *David A. Nowak*, Deputy Attorney General.

*Michael R. Lazerwitz* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Starr, Assistant Attorney General Gerson, Deputy Solicitor General Shapiro*, and *Barbara L. Herwig*.\*

---

\**Louis M. Bograd, Steven R. Shapiro*, and *Richard A. Waples* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of Wyoming et al. by *Joseph B. Meyer*, Attorney General of Wyoming, *Sylvia Lee Hackl*, Senior Assistant Attorney General, *Don Siegelman*, Attorney General of Alabama, *Douglas B. Baily*, Attorney General of Alaska, *Steve Clark*, Attorney General of Arkansas, *John K. Van de Kamp*, Attorney

JUSTICE WHITE delivered the opinion of the Court.

The issue in this case is whether a state prosecuting attorney is absolutely immune from liability for damages under 42 U. S. C. § 1983 for giving legal advice to the police and for participating in a probable-cause hearing. The Court of Appeals for the Seventh Circuit held that he is. 894 F. 2d 949 (1990). We affirm in part and reverse in part.

I

The relevant facts are not in dispute. On the evening of September 2, 1982, petitioner Cathy Burns called the Muncie, Indiana, police and reported that an unknown assailant had entered her house, knocked her unconscious, and shot and wounded her two sons while they slept. Two police officers, Paul Cox and Donald Scroggins, were assigned to investigate the incident. The officers came to view petitioner as their primary suspect, even though she passed a polygraph

General of California, *Duane Woodard*, Attorney General of Colorado, *John J. Kelly*, Chief State's Attorney of Connecticut, *Herbert O. Reid, Sr.*, Corporation Counsel of the District of Columbia, *Robert A. Butterworth*, Attorney General of Florida, *Warren Price III*, Attorney General of Hawaii, *Jim Jones*, Attorney General of Idaho, *Neil F. Hartigan*, Attorney General of Illinois, *Thomas J. Miller*, Attorney General of Iowa, *Frederic J. Cowan*, Attorney General of Kentucky, *James E. Tierney*, Attorney General of Maine, *J. Joseph Curran, Jr.*, Attorney General of Maryland, *Frank J. Kelley*, Attorney General of Michigan, *Hubert H. Humphrey III*, Attorney General of Minnesota, *Mike Moore*, Attorney General of Mississippi, *William L. Webster*, Attorney General of Missouri, *Marc Racicot*, Attorney General of Montana, *Brian McKay*, Attorney General of Nevada, *John P. Arnold*, Attorney General of New Hampshire, *Robert J. Del Tufo*, Attorney General of New Jersey, *Lacy H. Thornburg*, Attorney General of North Carolina, *Robert H. Henry*, Attorney General of Oklahoma, *Ernest D. Preate, Jr.*, Attorney General of Pennsylvania, *James E. O'Neil*, Attorney General of Rhode Island, *T. Travis Medlock*, Attorney General of South Carolina, *Roger A. Tellinghuisen*, Attorney General of South Dakota, *Charles W. Burson*, Attorney General of Tennessee, *Jim Mattox*, Attorney General of Texas, and *Paul Van Dam*, Attorney General of Utah; and for the California District Attorneys Association by *Edwin L. Miller, Jr.*, and *Thomas F. McArdle*.

examination and a voice stress test, submitted exculpatory handwriting samples, and repeatedly denied shooting her sons.

Speculating that petitioner had multiple personalities, one of which was responsible for the shootings, the officers decided to interview petitioner under hypnosis. They became concerned, however, that hypnosis might be an unacceptable investigative technique, and therefore sought the advice of the Chief Deputy Prosecutor, respondent Richard Reed. Respondent told the officers that they could proceed with the hypnosis.

While under hypnosis, petitioner referred to the assailant as "Katie" and also referred to herself by that name. The officers interpreted that reference as supporting their multiple-personality theory. As a result, they detained petitioner at the police station and sought respondent's advice about whether there was probable cause to arrest petitioner. After hearing about the statements that petitioner had made while under hypnosis, respondent told the officers that they "probably had probable cause" to arrest petitioner. See Tr. 108; see also *id.*, at 221. Based on that assurance, the officers placed petitioner under arrest.[1]

The next day, respondent and Officer Scroggins appeared before a county court judge in a probable-cause hearing, seeking to obtain a warrant to search petitioner's house and car. During that hearing, Scroggins testified, in response to respondent's questioning, that petitioner had confessed to shooting her children. Neither the officer nor respondent informed the judge that the "confession" was obtained under hypnosis or that petitioner had otherwise consistently denied

---

[1] Following her arrest, petitioner was placed in the psychiatric ward of a state hospital for four months. During that time, she was discharged from her employment, and the State obtained temporary custody of her sons. The medical experts at the hospital eventually concluded that petitioner did not have multiple personalities, and she was released.

shooting her sons. On the basis of the misleading presenta-
tion, the judge issued a search warrant.

Petitioner was charged under Indiana law with attempted
murder of her sons. Before trial, however, the trial judge
granted petitioner's motion to suppress the statements given
under hypnosis. As a result, the prosecutor's office dropped
all charges against petitioner.

On January 31, 1985, petitioner filed an action in the
United States District Court for the Southern District of In-
diana against respondent, Officers Cox and Scroggins, and
others. She alleged that the defendants were liable under 42
U. S. C. § 1983 for violating her rights under the Fourth,
Fifth, and Fourteenth Amendments to the United States
Constitution, and she sought compensatory and punitive
damages. Petitioner reached a settlement with several of
the defendants, and the case proceeded to trial against re-
spondent. After petitioner presented her case, the District
Court granted respondent a directed verdict, finding that
respondent was absolutely immune from liability for his
conduct.

Petitioner appealed to the United States Court of Appeals
for the Seventh Circuit. That court affirmed. 894 F. 2d 949
(1990). It held that "a prosecutor should be afforded abso-
lute immunity for giving legal advice to police officers about
the legality of their prospective investigative conduct." *Id.,*
at 956. In a brief footnote, the court also held that respond-
ent was absolutely immune from liability for his role in the
probable-cause hearing. *Id.,* at 955, n. 6. Because the
Courts of Appeals are divided regarding the scope of absolute
prosecutorial immunity,[2] we granted certiorari. 497 U. S.
1023 (1990).

---

[2] Since the decision in *Imbler* v. *Pachtman,* 424 U. S. 409 (1976), most
Courts of Appeals have held that prosecutors are not entitled to absolute
immunity for "investigative" or "administrative" acts. The courts, how-
ever, have differed in where they draw the line between protected and un-
protected activities. For example, the courts are split on the issue of

## II

Title 42 U. S. C. § 1983 is written in broad terms. It purports to subject "[e]very person" acting under color of state law to liability for depriving any other person in the United States of "rights, privileges, or immunities secured by the Constitution and laws."[3]   The Court has consistently recognized, however, that § 1983 was not meant "to abolish wholesale all common-law immunities." *Pierson* v. *Ray*, 386 U. S. 547, 554 (1967).   The section is to be read "in harmony with general principles of tort immunities and defenses rather than in derogation of them." *Imbler* v. *Pachtman*, 424 U. S. 409, 418 (1976); see also *Tenney* v. *Brandhove*, 341 U. S. 367, 376 (1951).   In addition, we have acknowledged that for some "special functions," *Butz* v. *Economou*, 438 U. S. 478, 508 (1978), it is "'better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.'" *Imbler*, *supra*, at 428 (quoting *Gregoire* v. *Biddle*, 177 F. 2d 579, 581 (CA2 1949) (L. Hand, J.), cert. denied, 339 U. S. 949 (1950)).

*Imbler*, *supra*, was the first case in which the Court addressed the immunity of state prosecutors from suits under

---

whether absolute immunity extends to the act of giving legal advice to the police.   Compare *Wolfenbarger* v. *Williams*, 826 F. 2d 930, 937 (CA10 1987), with 894 F. 2d 949 (CA7 1990) (case below); *Marx* v. *Gumbinner*, 855 F. 2d 783, 790 (CA11 1988); *Myers* v. *Morris*, 810 F. 2d 1437, 1449–1451 (CA8), cert. denied, 484 U. S. 828 (1987).

[3] Section 1983, which originated as § 1 of the Civil Rights Act of 1871, provides in full:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.   For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia." Rev. Stat. § 1979, as amended, 42 U. S. C. § 1983.

§ 1983.[4] Noting that prior immunity decisions were "predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and interests behind it," the Court stated that the "liability of a state prosecutor under § 1983 must be determined in the same manner." *Id.*, at 421. The Court observed that at common law prosecutors were immune from suits for malicious prosecution and for defamation, and that this immunity extended to the knowing use of false testimony before the grand jury and at trial. *Id.*, at 421–424, 426, and n. 23.

The interests supporting the common-law immunity were held to be equally applicable to suits under § 1983. That common-law immunity, like the common-law immunity for judges and grand jurors, was viewed as necessary to protect the judicial process. *Id.*, at 422–423. Specifically, there was "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Id.*, at 423.

The Court in *Imbler* declined to accord prosecutors only qualified immunity because, among other things, suits against prosecutors for initiating and conducting prosecutions "could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate," *id.*, at 425; lawsuits would divert prosecutors' attention and energy away from their important duty of enforcing the criminal law, *ibid.*; prosecutors would have more difficulty than other officials in meeting the standards for qualified immunity, *ibid.*; and potential liability "would prevent the vigorous and fearless performance of the pros-

---

[4] The Court previously had affirmed a decision holding that federal prosecutors were absolutely immune from suits for malicious prosecution. See *Yaselli* v. *Goff*, 275 U. S. 503 (1927), summarily aff'g 12 F. 2d 396 (CA2 1926).

ecutor's duty that is essential to the proper functioning of the criminal justice system," *id.*, at 427–428. The Court also noted that there are other checks on prosecutorial misconduct, including the criminal law and professional discipline, *id.*, at 429.

The Court therefore held that prosecutors are absolutely immune from liability under § 1983 for their conduct in "initiating a prosecution and in presenting the State's case," *id.*, at 431, insofar as that conduct is "intimately associated with the judicial phase of the criminal process," *id.*, at 430. Each of the charges against the prosecutor in *Imbler* involved conduct having that association, including the alleged knowing use of false testimony at trial and the alleged deliberate suppression of exculpatory evidence. The Court expressly declined to decide whether absolute immunity extends to "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of an advocate." *Id.*, at 430–431. It was recognized, though, that "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom." *Id.*, at 431, n. 33.

Decisions in later cases are consistent with the functional approach to immunity employed in *Imbler*. See, *e. g.*, *Westfall* v. *Erwin*, 484 U. S. 292, 296, n. 3 (1988); *Forrester* v. *White*, 484 U. S. 219, 224 (1988); *Malley* v. *Briggs*, 475 U. S. 335, 342–343 (1986); *Mitchell* v. *Forsyth*, 472 U. S. 511, 520–523 (1985); *Briscoe* v. *LaHue*, 460 U. S. 325 (1983); *Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982); *Butz* v. *Economou*, 438 U. S. 478 (1978). These decisions have also emphasized that the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question. *Forrester*, *supra*, at 224; *Malley*, *supra*, at 340; *Harlow*, *supra*, at 812; *Butz*, *supra*, at 506. The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their

duties. We have been "quite sparing" in our recognition of absolute immunity, *Forrester*, *supra*, at 224, and have refused to extend it any "further than its justification would warrant." *Harlow*, *supra*, at 811.

## III

We now consider whether the absolute prosecutorial immunity recognized in *Imbler* is applicable to (a) respondent's participation in a probable-cause hearing, which led to the issuance of a search warrant, and (b) respondent's legal advice to the police regarding the use of hypnosis and the existence of probable cause to arrest petitioner.

## A

We address first respondent's appearance as a lawyer for the State in the probable-cause hearing, where he examined a witness and successfully supported the application for a search warrant. The decision in *Imbler* leads to the conclusion that respondent is absolutely immune from liability in a § 1983 suit for that conduct.

Initially, it is important to determine the precise claim that petitioner has made against respondent concerning respondent's role in the search warrant hearing. An examination of petitioner's complaint, the decisions by both the District Court and the Seventh Circuit, and the questions presented in the petition for a writ of certiorari in this Court reveals that petitioner has challenged only respondent's participation in the hearing, and not his motivation in seeking the search warrant or his conduct outside of the courtroom relating to the warrant.

Petitioner's complaint alleged only the following with regard to respondent's role in the search warrant hearing:

> "Acting in his official capacity . . . , [respondent] facilitated the issuance of a search warrant when on September 22, 1982 he presented evidence to the Court with the full knowledge of the false testimony of the Defendant,

DONALD SCROGGINS. On direct examination, Deputy Prosecutor Reed asked of police officer Donald Scroggins various questions and in doing so and in concert with other Defendants deliberately misled the Court into believing that the Plaintiff had confessed to the shooting of her children." Complaint ¶ 9; see also *id.*, ¶ 31.

Obviously, that claim concerns only respondent's participation in the probable-cause hearing.

When directing a verdict for respondent after petitioner's presentation of her case, the District Court continued to view petitioner's search warrant claim as concerning only respondent's participation in the hearing. The District Court stated:

"Finally, as to getting the search warrant, you can characterize the proceeding before the judge as testimony by [respondent]. And if he asked leading questions — and I think he did — why, of course, you can say that. But the fact is that it was a proceeding in court before a judge. No matter what the form of the question was, the person seeking the search warrant and doing the testifying was the police officer. And what [respondent] was doing was . . . his job as a deputy prosecuting attorney and presenting that evidence. Even though it was fragmentary and didn't go far enough, he did it as a part of his official duties." Tr. 221.

This interpretation is further confirmed by the Seventh Circuit's summary of petitioner's claims on appeal:

"The question before the court is whether a state prosecutor is absolutely immune from suit under § 1983 for his acts of giving legal advice to two police officers about their proposed investigative conduct, *and for eliciting misleading testimony from one of the officers in a subsequent probable cause hearing.*" 894 F. 2d, at 950 (emphasis added). See also *id.*, at 955, n. 6.

Finally, the only "question presented" in the petition for a writ of certiorari that related to the search warrant hearing was limited to respondent's conduct in the hearing:

"II. Is a deputy prosecutor entitled to absolute immunity when he seeks a search warrant *in a probable cause hearing* and intentionally fails to fully inform the court by failing to state that the arrested person made an alleged confession while under hypnosis and yet had persistently denied committing any crime before and after the hypnosis?" Pet. for Cert. i (emphasis added).

Therefore, like the courts below, we address only respondent's participation in the search warrant hearing.[5]

Petitioner's challenge to respondent's participation in the search warrant hearing is similar to the claim in *Briscoe* v. *LaHue*, 460 U. S. 325 (1983). There, the plaintiff's § 1983 claim was based on the allegation that a police officer had given perjured testimony at the plaintiff's criminal trial. In holding that the officer was entitled to absolute immunity, we noted that witnesses were absolutely immune at common law from subsequent damages liability for their testimony in judicial proceedings "even if the witness knew the statements were false and made them with malice." *Id.*, at 332.

Like witnesses, prosecutors and other lawyers were absolutely immune from damages liability at common law for

---

[5] We are not persuaded by JUSTICE SCALIA's attempt to read more into petitioner's claims. See *post*, at 501–504. Although one snippet of respondent's testimony at trial related to his decision to go to court to seek the warrant, see Tr. 145, we are not aware of anything in the record showing either that respondent expressly or impliedly consented to an amendment of petitioner's claims or that petitioner sought to amend her complaint based on the evidence presented at trial. See Fed. Rule Civ. Proc. 15(b). As a result, JUSTICE SCALIA's argument that there was no common-law immunity for malicious procurement of a search warrant, *post*, at 504, is irrelevant. Cf. *Briscoe* v. *LaHue*, 460 U. S. 325, 330–331, n. 9 (1983) ("The availability of a common-law action for false accusations of crime . . . is inapposite because petitioners present only the question of § 1983 liability for false testimony during a state-court criminal trial").

making false or defamatory statements in judicial proceedings (at least so long as the statements were related to the proceeding), and also for eliciting false and defamatory testimony from witnesses. See, *e. g., Yaselli* v. *Goff,* 12 F. 2d 396, 401–402 (CA2 1926), summarily aff'd, 275 U. S. 503 (1927); *Youmans* v. *Smith,* 153 N. Y. 214, 219–220, 47 N. E. 265, 266–267 (1897); *Griffith* v. *Slinkard,* 146 Ind. 117, 122, 44 N. E. 1001, 1002 (1896); *Marsh* v. *Ellsworth,* 50 N. Y. 309, 312–313 (1872); *Jennings* v. *Paine,* 4 Wis. 358 (1855); *Hoar* v. *Wood,* 44 Mass. 193, 197–198 (1841). See also *King* v. *Skinner,* Lofft 55, 56, 98 Eng. Rep. 529, 530 (K. B. 1772), where Lord Mansfield observed that "neither party, witness, counsel, jury, or Judge can be put to answer, civilly or criminally, for words spoken in office."

This immunity extended to "any hearing before a tribunal which perform[ed] a judicial function." W. Prosser, Law of Torts § 94, pp. 826–827 (1941); see also Veeder, Absolute Immunity in Defamation, 9 Colum. L. Rev. 463, 487–488 (1909). In *Yaselli* v. *Goff,* 275 U. S. 503 (1927), for example, this Court affirmed a decision by the Circuit Court of Appeals for the Second Circuit in which that court had held that the common-law immunity extended to a prosecutor's conduct before a grand jury. See also, *e. g., Griffith, supra,* at 122, 44 N. E., at 1002; *Schultz* v. *Strauss,* 127 Wis. 325, 106 N. W. 1066 (1906).[6]

In addition to finding support in the common law, we believe that absolute immunity for a prosecutor's actions in a probable-cause hearing is justified by the policy concerns articulated in *Imbler.* There, the Court held that a prosecu-

---

[6] There is widespread agreement among the Courts of Appeals that prosecutors are absolutely immune from liability under § 1983 for their conduct before grand juries. See, *e. g., Buckley* v. *Fitzsimmons,* 919 F. 2d 1230, 1243 (CA7 1990); *Grant* v. *Hollenbach,* 870 F. 2d 1135, 1139 (CA6 1989); *Baez* v. *Hennessy,* 853 F. 2d 73, 74–75 (CA2 1988); *Morrison* v. *Baton Rouge,* 761 F. 2d 242 (CA5 1985); *Gray* v. *Bell,* 229 U. S. App. D. C. 176, 188, and n. 37, 712 F. 2d 490, 502, and n. 37 (1983), cert. denied, 465 U. S. 1100 (1984).

tor is absolutely immune for initiating a prosecution and for presenting the State's case. 424 U. S., at 431. The Court also observed that "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution." *Id.*, at 431, n. 33.

The prosecutor's actions at issue here—appearing before a judge and presenting evidence in support of a motion for a search warrant—clearly involve the prosecutor's "role as advocate for the State," rather than his role as "administrator or investigative officer," the protection for which we reserved judgment in *Imbler*, see *id.*, at 430–431, and n. 33.[7]

---

[7] The judge before whom the probable-cause hearing was held testified in the present case and described the procedure in her court for the issuance of search warrants. Her description is revealing as to the role of the prosecutor in connection with that judicial function:

"A. The general procedure is that the judge is presented with what we call an affidavit of probable cause. And in that affidavit are certain statements which are meant to apprise the Court of alleged facts in existence which would convince the Court that a search warrant should be issued.

"The other procedure is that a prosecutor or deputy prosecutor can ask the court for a closed-door hearing. And the courtroom is then locked in our county. Witnesses are presented for the purpose of convincing the court that there exists what we call probable cause for the issuance of search warrants. There can be one or many witnesses.

"Q. Thank you, Judge. In each of those instances, is the information presented to the Court either in affidavit form or in the form of personal testimony, sworn testimony?

"A. It is.

"Q. And would you tell the jury who, under the procedures you have just described, has the sole and exclusive power to seek a search warrant or approve the seeking of a search warrant?

"THE WITNESS: Who has this power?

"MR. SUTHERLIN: Yes.

"A. It would be the prosecutor of the county or one of the deputies.

"Q. Is it possible for a police officer to go directly to your court or any court and obtain a search warrant?

"A. No." Tr. 4–5.

In this case, of course, respondent appeared in court and presented testimony, and it is his conduct at that appearance that is the focus of the first issue in this case.

Moreover, since the issuance of a search warrant is unquestionably a judicial act, see *Stump* v. *Sparkman*, 435 U. S. 349, 363, n. 12 (1978), appearing at a probable-cause hearing is "intimately associated with the judicial phase of the criminal process." *Imbler, supra,* at 430. It is also connected with the initiation and conduct of a prosecution, particularly where the hearing occurs after arrest, as was the case here.

As this and other cases indicate, pretrial court appearances by the prosecutor in support of taking criminal action against a suspect present a substantial likelihood of vexatious litigation that might have an untoward effect on the independence of the prosecutor. Therefore, absolute immunity for this function serves the policy of protecting the judicial process, which underlies much of the Court's decision in *Imbler.* See, *e. g., Forrester,* 484 U. S., at 226; *Briscoe,* 460 U. S., at 334–335. Furthermore, the judicial process is available as a check on prosecutorial actions at a probable-cause hearing. "[T]he safeguards built into the judicial system tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct." *Butz,* 438 U. S., at 512. See also *Mitchell,* 472 U. S., at 522–523.

Accordingly, we hold that respondent's appearance in court in support of an application for a search warrant and the presentation of evidence at that hearing are protected by absolute immunity.

### B

Turning to respondent's acts of providing legal advice to the police, we note first that neither respondent nor the court below has identified any historical or common-law support for extending absolute immunity to such actions by prosecutors. Indeed, the Court of Appeals stated that its "review of the historical or commonlaw basis for the immunity in question does not yield any direct support for the conclusion that a prosecutor's immunity from suit extends to the act of giving legal advice to police officers." 894 F. 2d, at 955.

The Court of Appeals did observe that Indiana common law purported to provide immunity "'[w]henever duties of a judicial nature are imposed upon a public officer.'" *Ibid.* (quoting *Griffith* v. *Slinkard*, 146 Ind., at 121, 44 N. E., at 1002). The court then reasoned that giving legal advice is "of a judicial nature" because the prosecutor is, like a judge, called upon to render opinions concerning the legality of conduct. We do not believe, however, that advising the police in the investigative phase of a criminal case is so "intimately associated with the judicial phase of the criminal process," *Imbler*, 424 U. S., at 430, that it qualifies for absolute immunity. Absent a tradition of immunity comparable to the common-law immunity from malicious prosecution, which formed the basis for the decision in *Imbler*, we have not been inclined to extend absolute immunity from liability under § 1983. See, *e. g.*, *Malley*, 475 U. S., at 342.

The United States, as *amicus curiae*, argues that the absence of common-law support here should not be determinative because the office of public prosecutor was largely unknown at English common law, and prosecutors in the 18th and 19th centuries did not have an investigatory role, as they do today. Brief for United States as *Amicus Curiae* 20–21. We are not persuaded. First, it is *American* common law that is determinative, *Anderson* v. *Creighton*, 483 U. S. 635, 644 (1987), and the office of public prosecutor *was* known to American common law. See *Imbler, supra,* at 421–424. Second, although "the precise contours of official immunity" need not mirror the immunity at common law, *Anderson, supra,* at 645, we look to the common law and other history for guidance because our role is "not to make a freewheeling policy choice," but rather to discern Congress' likely intent in enacting § 1983. *Malley, supra,* at 342. "We do not have a license to establish immunities from § 1983 actions in the interests of what we judge to be sound public policy." *Tower* v. *Glover*, 467 U. S. 914, 922–923 (1984). Thus, for example, in *Malley, supra,* it was observed that "[s]ince the statute

[§ 1983] on its face does not provide for *any* immunities, we would be going far to read into it an absolute immunity for conduct which was only accorded qualified immunity in 1871." *Id.*, at 342.

The next factor to be considered—risk of vexatious litigation—also does not support absolute immunity for giving legal advice. The Court of Appeals asserted that absolute immunity was justified because "a prosecutor's risk of becoming entangled in litigation based on his or her role as a legal advisor to police officer is as likely as the risks associated with initiating and prosecuting a case." 894 F. 2d, at 955–956. We disagree. In the first place, a suspect or defendant is not likely to be as aware of a prosecutor's role in giving advice as a prosecutor's role in initiating and conducting a prosecution. But even if a prosecutor's role in giving advice to the police does carry with it some risk of burdensome litigation, the concern with litigation in our immunity cases is not merely a generalized concern with interference with an official's duties, but rather is a concern with interference with the conduct closely related to the judicial process. *Forrester, supra,* at 226; *Imbler, supra,* at 430. Absolute immunity is designed to free the *judicial process* from the harassment and intimidation associated with litigation. *Forrester, supra,* at 226. That concern therefore justifies absolute prosecutorial immunity only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct.

The Court of Appeals speculated that anything short of absolute immunity would discourage prosecutors from performing their "vital obligation" of giving legal advice to the police. 894 F. 2d, at 956. But the qualified immunity standard is today more protective of officials than it was at the time that *Imbler* was decided.[8] "As the qualified immunity defense

---

[8] In *Harlow* v. *Fitzgerald,* 457 U. S. 800 (1982), we "completely reformulated qualified immunity," *Anderson,* 483 U. S., at 645, replacing the common-law subjective standard with an objective standard that allows

has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley, supra,* at 341; see also *Mitchell,* 472 U. S., at 524. Although the absence of absolute immunity for the act of giving legal advice may cause prosecutors to consider their advice more carefully, "'[w]here an official could be expected to know that his conduct would violate statutory or constitutional rights, he *should* be made to hesitate.'" *Ibid.* (quoting *Harlow,* 457 U. S., at 819). Indeed, it is incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice. Cf. *Butz,* 438 U. S., at 505–506. Ironically, it would mean that the police, who do not ordinarily hold law degrees, would be required to know the clearly established law, but prosecutors would not.

The United States argues that giving legal advice is related to a prosecutor's roles in screening cases for prosecution and in safeguarding the fairness of the criminal judicial process. Brief for United States as *Amicus Curiae* 15–18. That argument, however, proves too much. Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive. Rather, as in *Imbler,* we inquire whether the prosecutor's actions are closely associated with the judicial process. Indeed, we implicitly rejected the United States' argument in *Mitchell, supra,* where we held that the Attor-

---

liability only where the official violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow, supra,* at 818. This change was "specifically designed to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment,' and we believe it sufficiently serves this goal." *Malley* v. *Briggs,* 475 U. S. 335, 341 (1986); see also *Mitchell* v. *Forsyth,* 472 U. S. 511, 524 (1985). Accordingly, it satisfies one of the principal concerns underlying our recognition of absolute immunity. See, *e. g., Imbler,* 424 U. S., at 419, n. 13.

ney General was not absolutely immune from liability for authorizing a warrantless wiretap. Even though the wiretap was arguably related to a potential prosecution, we found that the Attorney General "was not acting in a prosecutorial capacity" and thus was not entitled to the immunity recognized in *Imbler*. *Id.*, at 521.

As a final basis for allowing absolute immunity for legal advice, the Court of Appeals observed that there are several checks other than civil litigation to prevent abuses of authority by prosecutors. 894 F. 2d, at 956. Although we agree, we note that one of the most important checks, the judicial process, will not necessarily restrain out-of-court activities by a prosecutor that occur prior to the initiation of a prosecution, such as providing legal advice to the police. This is particularly true if a suspect is not eventually prosecuted. In those circumstances, the prosecutor's action is not subjected to the "crucible of the judicial process." *Imbler*, 424 U. S., at 440 (WHITE, J., concurring in judgment).

In sum, we conclude that respondent has not met his burden of showing that the relevant factors justify an extension of absolute immunity to the prosecutorial function of giving legal advice to the police.[9]

## IV

For the foregoing reasons, we affirm in part and reverse in part the judgment of the Court of Appeals.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE BLACKMUN joins, and with whom JUSTICE MARSHALL joins as to Part III, concurring in the judgment in part and dissenting in part.

I concur in the judgment as to the issues the Court reaches: I agree that a prosecutor has absolute immunity for eliciting

---

[9] Of course, in holding that respondent is not entitled to absolute immunity for rendering the legal advice in this case, we express no views about the underlying merits of petitioner's claims against respondent.

false statements in a judicial hearing, and that he has only qualified immunity for giving legal advice to police officers. I write separately because I think petitioner also makes a claim, which we ought to consider, that a constitutional violation occurred in the prosecutor's initiation of the search warrant proceeding. My understanding of the common-law practice, which governs whether absolute immunity exists under § 1983, is that this prosecutorial action would have enjoyed only qualified immunity. As to that portion of the case, a directed verdict on immunity grounds should not have been granted.

## I

On its face, § 1983 makes liable "every person" who deprives another of civil rights under color of state law. We have held, however, that the section preserves at least some of the immunities traditionally extended to public officers at common law. Thus, in *Tenney* v. *Brandhove*, 341 U. S. 367 (1951), we found legislators absolutely immune from § 1983 suits. Observing the existence of a common-law tradition of legislative immunity dating from 1689, *id.*, at 372–376, we refused to "believe that Congress . . . would impinge on a tradition so well grounded in history and reason by covert inclusion" in "the general language of its 1871 statute," *id.*, at 376. In *Pierson* v. *Ray*, 386 U. S. 547, 554–555 (1967), we found that absolute immunity for judges was "equally well established" at common law, so that Congress "would have specifically so provided had it wished to abolish the doctrine" for suits under § 1983. In *Briscoe* v. *LaHue*, 460 U. S. 325, 330–334 (1983), we reached the same conclusion regarding immunity for witnesses at trial.

While we have not thought a common-law tradition (as of 1871) to be a *sufficient* condition for absolute immunity under § 1983, see *Scheuer* v. *Rhodes*, 416 U. S. 232 (1974), we have thought it to be a *necessary* one:

"Our initial inquiry is whether an official claiming immunity under § 1983 can point to a common-law counterpart

to the privilege he asserts. . . . If 'an official was accorded immunity from tort actions at common law when the Civil Rights Act was enacted in 1871, the Court next considers whether § 1983's history or purposes nonetheless counsel against recognizing the same immunity in § 1983 actions.'" *Malley* v. *Briggs*, 475 U. S. 335, 339–340 (1986), quoting *Tower* v. *Glover*, 467 U. S. 914, 920 (1984).

Where we have found that a tradition of absolute immunity did not exist as of 1871, we have refused to grant such immunity under § 1983. See *Malley, supra; Tower, supra; Pulliam* v. *Allen*, 466 U. S. 522 (1984). That is so because the presumed legislative intent not to eliminate traditional immunities is our only justification for limiting the categorical language of the statute. "We do not have a license to establish immunities from § 1983 actions in the interests of what we judge to be sound public policy." *Tower, supra*, at 922–923. "[O]ur role is to interpret the intent of Congress in enacting § 1983, not to make a freewheeling policy choice." *Malley*, 475 U. S., at 342.[1]

---

[1] Our treatment of qualified immunity under § 1983 has been different. In *Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982), and *Anderson* v. *Creighton*, 483 U. S. 635 (1987), we extended qualified immunity beyond its scope at common law. Those cases are technically distinguishable, in that they involved not the statutory cause of action against state officials created by Congress in § 1983, but the cause of action against federal officials inferred from the Constitution by this Court in *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971). But the opinions made nothing of that distinction, citing § 1983 cases in support of their holdings. However, it would be a mistake to expand *Harlow* and *Anderson* to *absolute* immunity under § 1983, both because that would be contrary to our clear precedent described above and because, with respect to absolute immunity, the consequences are more severe. The common law extended qualified immunity to public officials quite liberally, and courts will not often have occasion to go further. Absolute immunity, however, was exceedingly rare, so that the scope for judicial rewriting of § 1983 in that respect is broad indeed.

In the present case, therefore, "[o]ur initial inquiry," *id.*, at 339, "the first and crucial question," *Pulliam*, 466 U. S., at 529, is "whether the common law recognized [the absolute immunities asserted]," *ibid.*

## II

Since my view of the record here requires me to reach a form of prosecutorial action not addressed by the Court, and one that is arguably more difficult to analyze under the common law, I think it well to set forth in at least some detail the nature of common-law immunities. Respondent has not cited, and I have not found, a single pre-1871 case in which a prosecutor was granted absolute immunity for any of the functions contested here. Indeed, as we have previously recognized, see *Imbler* v. *Pachtman*, 424 U. S. 409, 421 (1976), the first case extending *any* form of prosecutorial immunity was decided some 25 years after the enactment of § 1983. However, pre-1871 common-law courts did recognize several categories of immunities which, it is argued, would have extended to the prosecutorial functions contested here had the case arisen. The relevant categories are:

(1) Judicial immunity. This was an absolute immunity from all claims relating to the exercise of judicial functions. See, *e. g.*, T. Cooley, Law of Torts 408–409 (1880). It extended not only to judges narrowly speaking, but to

> "military and naval officers in exercising their authority to order courts-martial for the trial of their inferiors, or in putting their inferiors under arrest preliminary to trial; . . . to grand and petit jurors in the discharge of their duties as such; to assessors upon whom is imposed the duty of valuing property for the purpose of a levy of taxes; to commissioners appointed to appraise damages when property is taken under the right of eminent domain; to officers empowered to lay out, alter, and discontinue highways; to highway officers in deciding that a person claiming exemption from a road tax is not in fact

exempt, or that one arrested is in default for not having worked out the assessment; to members of a township board in deciding upon the allowance of claims; to arbitrators, and to the collector of customs in exercising his authority to sell perishable property, and in fixing upon the time for notice of sale." *Id.*, at 410–411 (footnotes omitted).

As is evident from the foregoing catalog, judicial immunity extended not only to public officials but also to private citizens (in particular jurors and arbitrators); the touchstone for its applicability was performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights. See *Steele* v. *Dunham*, 26 Wis. 393, 396–397 (1870) ("The board [of assessors] has to hear testimony; to ascertain facts; to correct errors, and arrive at results, according very much to the proceedings and processes of courts in the determination of causes; and hence they act judicially"); *Barhyte* v. *Shepherd*, 35 N. Y. 238, 241–242 (1866); *Wall* v. *Trumbull*, 16 Mich. 228, 235–237 (1867); E. Weeks, Damnum absque Injuria 209–210 (1879).

(2) Quasi-judicial immunity. This, unlike judicial immunity, extended only to government servants, protecting their "quasi-judicial" acts—that is, official acts involving policy discretion but not consisting of adjudication. Quasi-judicial immunity, however, was qualified, *i. e.*, could be defeated by a showing of malice. See, *e. g.*, *Billings* v. *Lafferty*, 31 Ill. 318, 322 (1863) (clerk of court); *Reed* v. *Conway*, 20 Mo. 22, 44–52 (1854) (surveyor-general); Weeks, *supra*, at 210, and n. 8; J. Bishop, Commentaries on Non-Contract Law § 786, pp. 365–366, and n. 1 (1889); Cooley, *supra*, at 411–413. I do not doubt that prosecutorial functions, had they existed in their modern form in 1871, would have been considered quasi-judicial (wherefore they are entitled to *qualified* immunity under § 1983, cf. *Pierson*, 386 U. S., at 557). See *Wight* v. *Rindskopf*, 43 Wis. 344, 354 (1877) (prosecutor acts as a quasi-judicial officer is deciding whether to dismiss a pending

case). But that characterization does *not* support absolute immunity.

(3) *Defamation immunity.* At common law, all statements made in the course of a court proceeding were absolutely privileged against suits for defamation. J. Townshend, Slander and Libel 347–367 (2d ed. 1872); Bishop, *supra*, §§ 295–300, pp. 123–125. Thus, an ordinary witness could not be sued at all; a complaining witness (*i. e.*, the private party bringing the suit) could be sued for malicious prosecution but not for defamation. This immunity did not turn upon the claimant's status as a public or judicial officer, for it protected private parties who served as witnesses, and even as prosecuting witnesses. The immunity extended, however, *only* against suits for defamation.

## III

I turn next to the application of these common-law immunities to the activities at issue here. In the Court's view, petitioner makes two claims: (1) that the prosecutor gave incorrect legal advice, and (2) that he elicited false or misleading testimony at the hearing. As to the first, I agree that neither traditional judicial nor defamation immunity is applicable, though (as I have said) quasi-judicial immunity is. The prosecutor may therefore claim only qualified immunity. As to the second, I agree that the traditional defamation immunity is sufficient to provide a historical basis for absolute § 1983 immunity. In *Briscoe*, 460 U. S., at 330–334, we found defamation immunity sufficient to immunize witnesses for all in-court statements. The traditional defamation immunity also extended to lawyers in presenting evidence, see Townshend, *supra*, at 357–358, and accordingly the immunity recognized in *Briscoe* applies here.

Unlike the Court, however, I do not think that disposes of petitioner's claims. The Court asserts that "petitioner has challenged only respondent's participation in the hearing, and not his motivation in seeking the search warrant." *Ante*, at

487. That is true if one looks solely to the complaint. But since the present case comes to us after a directed verdict, the evidence at trial must also be considered.

> "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence . . . may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues." Fed. Rule Civ. Proc. 15(b).

Reviewing the whole of petitioner's evidence, it appears that she alleged improper action by respondent in approving the search warrant application. The judge that heard respondent's application testified at trial:

> "Q: [by petitioner's counsel] And would you tell the jury who, under the procedures you have just described, has the sole and exclusive power to seek a search warrant or approve the seeking of a search warrant?
>
> "THE WITNESS: Who has this power?
>
> "[PETITIONER'S COUNSEL]: Yes.
>
> "A: It would be the prosecutor of the county or one of the deputies." Tr. 5.

Respondent Reed testified as follows:

> "Q: [by petitioner's counsel] Can you give the jury any details about the case which you relied upon *in making this decision to seek a search warrant?*
>
> "A: I don't think I relied on anything to seek a search warrant. I was told they wanted a search warrant. I went into court to ask the officers what it was they based their request on.
>
> "Q: Do you remember answering some interrogatories in June of 1985?
>
> "A: Yes, I do.

"Q: (Reading)

" 'Q: List each and every item of evidence upon which you relied *prior to making the decision to request a search warrant?* . . . .

" 'A: I relied on the facts that the statement of the accused as to the circumstances of the shooting appeared implausible, that there appeared to be insufficient injury to the accused to substantiate her story that she had been knocked out by an unknown assailant, that her sister-in-law verified that she had a .22 caliber pistol, that under hypnosis she indicated that she disposed of the pistol, which tallied with the fact that the weapon was never found, that the statements made under hypnosis indicated her guilt, and that she failed a polygraph test.'

"(Reading concludes)

"Is that your answer?   Do you want to look at it?"   *Id.*, at 144–145 (emphasis added).

Finally, Officer Stonebraker, the police liaison with the prosecutor's office, testified: " 'The decision to seek a search warrant . . . was not made by me, but by my superiors in the [prosecutor's office].' "   Deposition of Jack Stonebraker, Plaintiff's Exhibit A, p. 18.

Petitioner alleged in her complaint that respondent knew or should have known that hypnotically induced testimony was inadmissible, see Complaint ¶ 29.   Given the judge's testimony that the application could not have proceeded without prosecutorial approval, and Reed's conflicting testimony as to whether he in fact made that decision, I think the record contained facts sufficient for the jury to find that respondent wrongfully initiated the search warrant proceeding.   Moreover, although this basis for setting aside the directed verdict was not passed upon below, I think it was adequately raised here.   Petitioner's second question presented asks whether a prosecutor is absolutely immune "when he seeks a search warrant in a probable cause hearing *and* intentionally fails to

fully inform the court [of relevant circumstances]." Brief for Petitioner i (emphasis added). It is plausible to read this as challenging *both* the decision to apply for a search warrant *and* the in-court statements at the hearing; and petitioner's arguments support that reading. The petition for certiorari, for example, questions immunity for the function of "securing a search warrant," and both the petition and the opening brief cite cases involving approval of applications rather than in-court activity. See Pet. for Cert. 6–7; Brief for Petitioner 10–11 (both citing *Liffiton* v. *Keuker*, 850 F. 2d 73 (CA2 1988), and *McSurely* v. *McClellan*, 225 U. S. App. D. C. 67, 697 F. 2d 309 (1982)). The United States as *amicus curiae* supporting respondent evidently understood that the approval function (or, as the United States calls it, the "screening" function) was at issue, since it addressed that question in some detail. See Brief for United States as *Amicus Curiae* 23–25.

Thus, while the issue has not been presented with the utmost clarity, I think it sufficiently before us. I would find no absolute immunity. As discussed above, the only relevant common-law absolute immunities were defamation immunity and judicial immunity. At common law, the tort of maliciously procuring a search warrant was not a species of defamation (an unintentional tort) but a form of the intentional tort of malicious prosecution. See 3 F. Wharton, Criminal Law 234 (7th rev. ed. 1874); *Carey* v. *Sheets*, 67 Ind. 375, 378 (1879). Defamation immunity was unavailable as a defense. Nor would judicial immunity have been applicable here, since respondent undertook no adjudication of rights. It is clear that a private party's action in seeking a search warrant did not enjoy "judicial" immunity, see, *e. g.*, *Miller* v. *Brown*, 3 Mo. 94, 96 (1832); *Carey* v. *Sheets*, *supra*, at 378–379, and though no cases exist there is no reason why a similar action by a prosecutor would have been treated differently. I think it entirely plain that, in 1871 when § 1983 was enacted, there was no absolute immunity for procuring a search warrant.

An additional few words are needed, however, regarding our decision in *Imbler*. *Imbler* granted a prosecutor absolute immunity against a § 1983 claim that he had sought a grand jury indictment maliciously. It relied for that holding upon a common-law tradition of prosecutorial immunity that developed much later than 1871, and was not even a logical extrapolation from then-established immunities. While I would not, for the reasons stated above, employ that methodology here,[2] the holding of *Imbler* remains on the books, and for reasons of *stare decisis* I would not abandon it. It could be argued, therefore, that a prosecutor's role in seeking a search warrant is akin to a prosecutor's role in seeking an indictment, and thus that *Imbler*'s holding alone governs the present suit. But insofar as the *relevant* factors are concerned, this case is further from *Imbler* than was *Malley*, which denied absolute immunity to a policeman for procuring an arrest warrant. *Imbler* recognized absolute immunity out of a desire to protect actions "intimately associated with the judicial phase of the criminal process." 424 U. S., at 430. *Malley* rejected a further extension because the act of procuring an arrest warrant "is further removed from the judicial phase of criminal proceedings than the act of a prosecutor in seeking an indictment." 475 U. S., at 342–343. The

---

[2] Even if it were applied, respondent would not prevail, since there is not even any post-1871 tradition to support prosecutorial immunity in the obtaining of search warrants. Cases considering whether such an immunity exists are few and divided in their conclusions. Compare *Anderson* v. *Manley*, 181 Wash. 327, 331, 43 P. 2d 39, 40 (1935) (absolute immunity), with *Cashen* v. *Spann*, 66 N. J. 541, 551, 334 A. 2d 8, 13 (1975) (qualified immunity); see also *Torres* v. *Glasgow*, 80 N. M. 412, 417, 456 P. 2d 886, 891 (1969) (extent of immunity unclear). Suits against policemen for obtaining search warrants generally deny absolute immunity. See, *e. g.*, *State ex rel. Hedgepeth* v. *Swanson*, 223 N. C. 442, 444–445, 27 S. E. 2d 122, 123 (1943); *Peterson* v. *Cleaver*, 124 Ore. 547, 559, 265 P. 428, 432 (1928). See also *Motley* v. *Dugan*, 191 S. W. 2d 979, 982 (Mo. App. 1945) (qualified immunity for policeman seeking arrest warrant); *Kidd* v. *Reynolds*, 20 Tex. Civ. App. 355, 358, 50 S. W. 600, 601 (1899) (same).

act of procuring a mere *search* warrant is further removed still. Nor would it be proper to follow *Imbler* rather than *Malley* because the defendant is a prosecutor, as in *Imbler*, rather than a policeman, as in *Malley*. We have made clear that "it [is] the nature of the function performed, not the identity of the actor who perform[s] it, that inform[s] our immunity analysis." *Forrester* v. *White*, 484 U. S. 219, 229 (1988) (denying absolute immunity to a judge sued for a nonjudicial act); see also *Ex parte Virginia*, 100 U. S. 339, 348 (1880) ("Whether the act done by [a judge] was judicial or not is to be determined by its character, and not by the character of the agent").

\* \* \*

For the foregoing reasons, I concur in the judgment of the Court in part and dissent in part.