**Arthur J. BREWSTER,**
**Plaintiff–Appellee,**

v.

**The BOARD OF EDUCATION OF THE LYNWOOD UNIFIED SCHOOL DISTRICT, Audrey M. Clarke, as an individual and in her official capacity, Althea L. Jenkins, as an individual and in her official capacity, Gary D. Furuno, as an individual and in his official capacity, Richard Armstrong, as an individual and in his official capacity, Laura M. Byrd, as an individual and in her official capacity, Rachel Chavez, as an individual and in her official capacity, Cynthia Green–Geter, as an individual and in her official capacity, Thelma Calvin–Williams, as an individual and in her official capacity, and Does 1–50, inclusive, Defendants–Appellants.**

No. 97–55203.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 7, 1998.

Decided July 13, 1998.

---

Warren S. Kinsler, argued, Aaron V. O'Donnell, on the brief, Atkinson, Andelson, Loya, Ruud & Romo, Cerritos, California, for the appellants.

James H. Fosbinder, Fosbinder & Fosbinder, Venice, California, for the appellee.

Before: FARRIS, O'SCANNLAIN, and FERNANDEZ, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must decide whether school officials who downgraded and ultimately dismissed a teacher may be held personally liable for allegedly violating First and Fourteenth Amendment rights.

## I

Arthur Brewster applied for an elementary school teaching position with the Lynwood, California, Unified School District ("the District") in July 1994. In September, the District hired Brewster as a first-year probationary teacher at the Will Rogers Elementary School ("the school"). Less than four months later, however, Brewster received formal notice that his contract with the school would not be renewed. Brewster's § 1983 claims arise out of two separate and unrelated series of events. The first culminated in the reduction of his salary, and the second resulted in the District's decision not to renew his contract following his first year.

### A

On his employment application, Brewster listed his prior experience as follows: nine years as a superintendent, one year as a principal, one year as an associate professor at the graduate school level, and six years as a teacher-principal. California law provides that public school teachers "shall be classified on the salary schedule on the basis of uniform allowance for years of training and years of experience." Cal. Educ.Code § 45028. School districts are free to define "experience" for purposes of their salary schedules, provided that they administer their definitions uniformly. See Mayer v. Board of Trustees, 106 Cal.App.3d 476, 165 Cal.Rptr. 655, 662 (1980). The District defines "experience" to include full-time kindergarten-through-twelfth-grade teaching experience, but not administrative or college-level experience. Brewster disputes the District's definition.

Subsequent to his hiring, but prior to his entering into service, Brewster was informed that Althea Jenkins, the Assistant Superintendent for Personnel Services, had reviewed his credentials and placed him at Step 15 of the salary schedule, which equated to a salary of $48,304 plus a $350 stipend for his doctorate degree. Brewster's contract stated that "starting salary is based on verified information at the time of the offer of employment" and that "experience verification will be accepted for sixty (60) days to be retroactive to the starting date." Shortly after he began teaching, Brewster received a memorandum from Jenkins informing him that the District needed the addresses of his former employers so that it could verify the information provided in his application. The

parties dispute whether Brewster in fact supplied the requested information.

On December 2, 1994, Jenkins sent to Brewster a memorandum notifying him that only three years of "teaching experience" had been verified by his former employers, and that if additional verification was not received by December 9, the Board of Education would take steps to adjust Brewster's salary. Jenkins sent a second memorandum to Brewster on December 7, alerting him that without the additional verification, his placement on the salary schedule would be corrected to place him at Step 4 instead of Step 15. On December 13, the Board took action to reduce Brewster's salary.

Two days later, Brewster and his union representative, Wiley Jones, met with Jenkins regarding the salary placement issue. Jenkins indicated that she was willing to restore Brewster to his original place in the salary scale if he could demonstrate that other District teachers had previously been given salary-schedule credit for non-teaching, administrative experience. Given the opportunity to present evidence, Brewster informed Jenkins that he believed that another teacher, Rosemary Carrillo, had been given such credit. On January 9, 1995, Jenkins reviewed Brewster's evidence regarding Carrillo and concluded that Carrillo had not, in fact, been awarded salary-schedule credit for administrative experience. Jenkins therefore notified Brewster to confirm that his salary would indeed be reduced.

**B**

Shortly after beginning teaching at the school, Brewster became involved in the Lynwood Teachers Association as a grievance representative. Brewster informed his principal, Gary Furuno, of his union involvement. Furuno attested that he was pleased that Brewster had decided to become a grievance representative because, prior to becoming principal, he himself had served in a similar capacity in the union. As a grievance representative, Brewster filed several complaints, both on behalf of individual teachers and on behalf of the union in general.

The school officials assert that almost immediately after Brewster began teaching, Furuno recognized that Brewster was experiencing difficulties maintaining classroom discipline. For instance, during the months of September and October of 1994, Brewster referred twenty and nineteen students, respectively, to the principal's office. Furuno also reports that soon after Brewster's arrival at the school, parents and other employees began to express their concerns about Brewster's lack of classroom management. Furuno states that Brewster was "unable to develop a good working relationship with either his students or some of the other teachers with whom he was required to work." According to Furuno, he suspected in early October, and concluded by November, that he had made a mistake in hiring Brewster and that he would recommend Brewster's "nonreelection" (i.e., contract nonrenewal) before the end of the school year.

In late November 1994, in a meeting with Audrey Clarke, the Superintendent of the District, Brewster raised concerns that his daily attendance records were being falsified by the school's attendance clerk in order to increase the school's "Average Daily Attendance" ("ADA"). Brewster reported in his declaration that Clarke "simply stated that changing attendance records was very important because they affect ADA and therefore the amount of federal funding received." Clarke claims that she has no recollection of making such a statement. Shortly after his meeting with Clarke, Brewster confronted Furuno's secretary with what he believed to be an error in the attendance register. He also reported the alleged errors to Furuno, who assured Brewster that he would review the attendance records himself. In examining Brewster's classroom attendance register, however, Furuno found no errors. Furuno's review of the attendance records was confirmed by an independent audit, which revealed no significant errors in the school's attendance accounting procedures.

Furuno conducted a formal observation of Brewster's classroom in mid-December. Although Furuno claimed that the observation "further confirmed the necessity of recommending nonreelection," Brewster reported

that Furuno told him that everything was "fine." Brewster never received a written evaluation.

In a letter dated January 23, 1995, Furuno formally notified Brewster of his decision to recommend Brewster's nonreelection to the Board. Furuno made his formal recommendation to the Board later that month. In February, Brewster was notified by Assistant Superintendent Jenkins that he had the right to address the Board regarding his nonreelection if he so desired. At the Board's February 28 meeting, Brewster argued, for the first time, that his proposed nonreelection was in retaliation for protected union activity. A month later, Brewster received a "Notice of Non–Reemployment/Non–Reelection" providing that his employment with the District would be terminated on June 30.

### C

Brewster sued Furuno, Jenkins, Clarke, the Board of Education, and its individual members in federal district court. In his complaint, he alleged seven separate causes of action, two of which were premised upon § 1983 and five of which were premised upon state law. The district court dismissed the state claims. The Board and the individual officials moved for summary judgment on the federal claims. The district court granted the motion with respect to Brewster's failure-to-train claim, but denied the motion—and denied the claims of qualified immunity—with regard to the free speech and procedural due process challenges.

The school officials appealed the district court's rejection of their claims of qualified immunity.

### II

■ The threshold question is whether we have jurisdiction to entertain this interlocutory appeal. In *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Supreme Court held that a district court's denial of a motion for summary judg-

ment predicated on a claim of qualified immunity is, as a general matter, immediately appealable under 28 U.S.C. § 1291 pursuant to the "collateral order doctrine." *Id.* at 527, 105 S.Ct. 2806. As with almost every rule, however, there is an exception: "[A] defendant entitled to invoke a qualified-immunity defense, may *not* appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record set forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319–20, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) (emphasis added). Thus, appellate jurisdiction over a summary judgment denial of qualified immunity is limited to reviewing the "purely legal" issue "whether the facts alleged [by the plaintiff] support a claim of violation of clearly established law." *Mitchell,* 472 U.S. at 528 n. 9, 105 S.Ct. 2806; *accord Armendariz v. Penman,* 75 F.3d 1311, 1317 (9th Cir.1996) (en banc).

■ It cannot be doubted that there are contested factual issues in this case. Indeed, our own recitation of the facts demonstrates as much. However, the fact "[t]hat the parties dispute some of the facts does not render the denial of qualified immunity nonappealable." *P.B. v. Koch,* 96 F.3d 1298, 1301 (9th Cir.1996). As the Supreme Court recently explained:

> Denial of summary judgment often includes a determination that there are controverted issues of material fact, and *Johnson* surely does not mean that every such denial of summary judgment is nonappealable. *Johnson* held, simply, that determinations of evidentiary sufficiency at summary judgment are not immediately appealable.

*Behrens v. Pelletier,* 516 U.S. 299, 116 S.Ct. 834, 842, 133 L.Ed.2d 773 (1996) (citations omitted). The officials in this case are not contesting issues of "evidentiary sufficiency" (as were the defendants in *Johnson* );[1] rather, they merely contend that "even on Plaintiff's version of the relevant disputed facts, no clearly established law indicated that 'what [they were] doing' violated th[e] law."

---

1. The school officials do raise two "evidentiary sufficiency" arguments as fallback positions. However, in light of our disposition of the "clear-

ly established" issue, we find it unnecessary to reach those contentions. *See infra* notes 5 and 10.

Consequently, we conclude that we do possess jurisdiction over the narrow but important question whether the rights that Brewster claims were clearly established at the time of the alleged deprivations. In resolving the appeal, we simply assume the disputed facts in the light most favorable to Brewster, and then decide, under those facts, whether the school officials violated any of Brewster's clearly established constitutional rights. *See Johnson,* 515 U.S. at 319, 115 S.Ct. 2151; *Chateaubriand v. Gaspard,* 97 F.3d 1218, 1222 (9th Cir.1996).

## III

■ The rule of qualified immunity is a familiar one: Public officials are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The plaintiff shoulders the burden of proving that the rights he claims are "clearly established." *See Davis v. Scherer,* 468 U.S. 183, 197, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). The Supreme Court has made clear that qualified immunity provides a protection to government officers that is quite far-reaching. Indeed, it safeguards "all but the plainly incompetent or those who knowingly violate the law.... [I]f officers of reasonable competence could disagree on th[e] issue [whether a chosen course of action is constitutional], immunity should be recognized." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *see also Knox v. Southwest Airlines,* 124 F.3d 1103, 1107 (9th Cir.1997) ("Th[e] test allows ample room for reasonable error on the part of the [government official].").

■ The Supreme Court has also amplified what it means for a right to be "clearly established" within the meaning of *Harlow.* Specifically, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In other words, before being charged with monetary liability, public offi-

cials must be given clear notice that their conduct is unlawful. To that end, the Supreme Court has observed that the *Harlow* standard "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Id.* at 639, 107 S.Ct. 3034. In assessing claims of qualified immunity, reviewing courts must not view constitutional rights in the abstract but rather "in a more particularized, and hence more relevant, sense." *Id.* at 640, 107 S.Ct. 3034. Thus, in order to ensure that government officials receive necessary guidance, courts should focus the qualified immunity inquiry at the level of implementation. As this court has put the matter, "the right referenced by the *Harlow* test is not a general constitutional guarantee ... but its application in a particular context." *Todd v. United States,* 849 F.2d 365, 370 (9th Cir.1988); *accord Kelley v. Borg,* 60 F.3d 664, 667 (9th Cir.1995) ("[B]road rights must be particularized before they are subjected to the clearly established test."). In other words, courts adjudicating claims of qualified immunity must look not to constitutional guarantees themselves but to the various doctrinal tests and standards that have been developed to implement and to administer those guarantees. *See generally* Richard H. Fallon, *The Supreme Court, 1996 Term—Foreword: Implementing the Constitution,* 111 Harv. L.Rev. 56, 56 (1997) ("Even when general agreement exists that the Constitution reflects a particular value or protective purpose, questions of implementation often remain.").

## A

Brewster first claims that his nonreelection was in retaliation for his work as a union grievance representative and his allegations regarding what he believed to be errors in the schools' attendance-accounting practices. He argues that the District's decision not to rehire him on these bases violated his First Amendment right to free speech. The officials respond that Brewster's filing of union grievances and reporting of alleged attendance-accounting errors do not constitute speech protected by the First Amendment.

■ Public employees do not by virtue of their employment altogether relinquish the

First Amendment rights that they would otherwise enjoy as United States citizens. *See United States v. National Treasury Employees Union,* 513 U.S. 454, 465, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995). Nor, however, do public employees enjoy anything that approaches an "absolute" freedom of speech. *See Board of County Comm'rs v. Umbehr,* 518 U.S. 668, 116 S.Ct. 2342, 2347, 135 L.Ed.2d 843 (1996). In fact, the Supreme Court has expressly recognized that "the government as employer ... has far broader powers [to restrict expression] than does the government as sovereign." *Waters v. Churchill,* 511 U.S. 661, 671, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). When a public employee alleges that he has been discharged (or, in this case, nonreelected) in retaliation for exercising his First Amendment rights, courts must engage in a three-part inquiry:

> To prevail, an employee must prove (1) that the conduct at issue is constitutionally protected, and (2) that it was a substantial or motivating factor in the [nonreelection]. If the employee discharges that burden, (3) the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct.

*Umbehr,* 116 S.Ct. at 2347 (enumeration added). As a probationary teacher who entered into service in September 1994, Brewster was subject to nonreelection for any legal reason prior to March 15, 1996. *See* Cal. Educ.Code § 44929.21. For the purposes of this appeal, however, the officials do not contend that the decision to nonreelect him was premised upon his alleged ineptitudes as a teacher; rather, they concede that Furuno was motivated to recommend Brewster's nonreelection by Brewster's speech concerning errors in the attendance-reporting process. Moreover, they do not argue that Brewster would have been nonreelected in the absence of his speech. As a result, in evaluating the individual officials' entitlement to qualified immunity, the only issue before us is whether it was "clearly established" in early 1995 that Brewster's speech was de-

serving of constitutional protection. If it was, we must affirm; if not, we must reverse.

■ Obviously, "[a] necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). In order for a public employee's speech to be "protected" under the First Amendment within the meaning of step one of the three-step test, (1) the speech must involve a matter of public concern and (2) the employee's interest in expressing himself must outweigh the State's interests in promoting workplace efficiency and avoiding workplace disruption. *See Waters,* 511 U.S. at 668, 114 S.Ct. 1878.

**1**

"In evaluating the First Amendment rights of a public employee, the threshold inquiry is whether the statements at issue substantially address a matter of public concern." *Roe v. City & County of San Francisco,* 109 F.3d 578, 584 (9th Cir.1997). If they do not, then the First Amendment is not triggered at all, and "it is unnecessary ... to scrutinize the reasons" for the employer's action. *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The district court in this case concluded that Brewster's allegations regarding attendance-accounting errors were of public concern because the attendance figures "determine[d] the amount of federal funding that the school received." [2] In order to determine whether an employee's speech involves a matter of public concern, a reviewing court must scrutinize "the content, form and context of [the] statement." *Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684. If employee expression relates to an issue of "political, social, or other concern to the community," it may fairly be said to be of public concern. *Id.* at 146, 103 S.Ct. 1684.

As an initial matter, the parties dispute whether Brewster's allegations regarding the school's attendance register were merely claims that the records contained "errors" or

---

2. The district court determined that Brewster's union activity "did not concern issues that would

matter to the public." For obvious reasons, the school officials have not appealed that ruling.

instead constituted charges of something more sinister, namely, that school officials were deliberately and fraudulently falsifying records in order to increase funding. The factual record suggests that during a meeting with Superintendent Clarke in late November 1994, Brewster did, in fact, raise his concerns that attendance records were being "falsified" by the attendance clerk in order to increase "Average Daily Attendance" figures. However, in a subsequent meeting with Principal Furuno, Brewster claimed only that he believed that there were "errors" in the attendance records. It is significant, in this respect, that the district court found in its order that "although the Board of Education had to approve of Brewster's nonreelection, the decision to nonreelect Brewster effectively was Furuno's alone." Moreover, nothing in the record suggests either that Clarke's involvement, if any, in the decision not to reelect Brewster had anything to do with the attendance-reporting allegations,[3] or that Clarke ever communicated the substance of his conversation with Brewster to Furuno. Consequently, it appears from the record that the speech that purportedly got Brewster into trouble was his allegation of accounting "errors" to Furuno, not his charge of accounting "fraud" to Clarke.

For the purposes of this appeal, however, we shall simply assume, without deciding, that Brewster's allegations—whether of errors or of fraud—constitute speech on a matter of public concern, and are therefore within the ambit of the First Amendment.

### 2

 Of course, the fact that an employee's expression touches on an issue of public concern does not automatically entitle him to recovery. The "public concern" prong is a necessary, but not a sufficient, condition of constitutional protection. It merely brings the claim within the "coverage" of the First Amendment, and thus "ensures that a court will test the reasons for restriction against

first amendment standards." Frederick Schauer, *Public Figures,* 25 Wm. & Mary L.Rev. 905, 932 n.113 (1984). In determining whether speech involving a matter of public concern merits constitutional protection, courts engage in a balancing test, first announced in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968):

> The question whether speech of a government employee is constitutionally protected expression necessarily entails striking "a balance between the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

*Mount Healthy City Sch. Dist. v. Doyle,* 429 U.S. 274, 284, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (quoting *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731). In conducting this balancing, courts must give government employers "wide discretion and control over the management of [their] personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch." *Connick,* 461 U.S. at 151, 103 S.Ct. 1684 (quoting *Arnett v. Kennedy,* 416 U.S. 134, 168, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (Powell, J., concurring)). Moreover, public employers need not allege that an employee's expression actually disrupted the workplace; "reasonable predictions of disruption" are sufficient. *Waters,* 511 U.S. at 673, 114 S.Ct. 1878.

 This court has observed that the *Pickering* test "requires particularized balancing on the unique facts presented in each case," *Voigt v. Savell,* 70 F.3d 1552, 1560–61 (9th Cir.1995), and the Supreme Court has specifically stated that the *Pickering* balance is a "difficult" one to strike, *see Connick,* 461 U.S. at 150, 103 S.Ct. 1684. Because, under *Pickering,* the determination whether an employee's expression is constitutionally pro-

---

**3.** Brewster's only assertion of Clarke's personal involvement in the decision to nonreelect related to Clarke's purported knowledge of Brewster's union activities. The district court, however, concluded that Brewster's actions as a grievance representative did not implicate matters of public

concern, and were thus outside the scope of the First Amendment altogether. *See supra* note 2. Consequently, we need not concern ourselves with Clarke's involvement, or the statements made to Clarke regarding "falsification" of accounting records.

tected requires a fact-sensitive, context-specific balancing of competing interests, the law regarding public-employee free speech claims will "rarely, if ever, be sufficiently 'clearly established' to preclude qualified immunity under *Harlow* and its progeny." *Moran v. Washington,* 147 F.3d 839, 847 (9th Cir. 1998); *accord Kincade v. City of Blue Springs,* 64 F.3d 389, 398 (8th Cir.1995); *DiMeglio v. Haines,* 45 F.3d 790, 806 (4th Cir.1995); *O'Connor v. Steeves,* 994 F.2d 905, 917 n. 11 (1st Cir.1993); *Guercio v. Brody,* 911 F.2d 1179, 1183–85 (6th Cir.1990); *Melton v. City of Oklahoma City,* 879 F.2d 706, 729 (10th Cir.1989), *modified on other grounds,* 928 F.2d 920 (1991) (en banc); *Dartland v. Metropolitan Dade County,* 866 F.2d 1321, 1323 (11th Cir.1989); *Noyola v. Texas Dep't of Human Resources,* 846 F.2d 1021, 1025 (5th Cir.1988); *Benson v. Allphin,* 786 F.2d 268, 276 (7th Cir.1986); *cf. Baker v. Racansky,* 887 F.2d 183, 187 (9th Cir.1989) ("[I]f the existence of a right or the degree of protection it warrants in a particular context is subject to a balancing test, the right can rarely be considered 'clearly established' at least in the absence of closely corresponding factual and legal precedent." (quoting *Myers v. Morris,* 810 F.2d 1437 (8th Cir.1987)) (internal quotation marks omitted)).

Despite the fact that employee-free-speech rights will not, as a general matter, be clearly established under *Harlow* and *Anderson,* we must determine whether the specific facts of this case present one of those rare instances in which *Pickering* rights are, despite balancing, clearly established. At oral argument, in the course of arguing that the District had violated his clearly established rights, Brewster's counsel declared that "[e]verybody knows about the First Amendment." That may very well be so; however, Brewster's chosen characterization of the pertinent legal rule—"the First Amendment"—is precisely the broad-based characterization that the Supreme Court has forbidden in the qualified immunity context. *See Anderson,* 483 U.S. at 640, 107 S.Ct. 3034 (directing reviewing courts to view claimed constitutional and statutory rights in a "particularized" sense). The legal right at issue is not the generic right to free speech. Nor

is it the right to be free from expression-based retaliatory discipline or discharge. Rather, whether or not Brewster enjoyed a clearly established right to speak "depends upon the sensitive ad hoc balancing that *Pickering* entails." *Moran,* 147 F.3d 839, 845. The issue the court must decide, therefore, is whether the outcome of the *Pickering* balance so clearly favored Brewster that it would have been patently unreasonable for the school officials to conclude that the First Amendment did not protect his speech. *See Romero v. Kitsap County,* 931 F.2d 624, 627 (9th Cir.1991).

In striking the balance, we emphasize that Brewster's interest in speaking out on a matter of public concern cannot be gainsaid. We have assumed that the alleged errors in the school's attendance accounting were not "matters of only personal interest." *Connick,* 461 U.S. at 147, 103 S.Ct. 1684. And we acknowledge that Brewster's charges were far more consequential than the banal "workplace grievance" found undeserving of constitutional protection in *Havekost v. United States Department of Navy,* 925 F.2d 316 (9th Cir.1991). Rather, the claimed reporting errors—even if only accidental—would have directly impacted the amount of funding available to the school. Consequently, as taxpayers, "the public or community [was] likely to be truly interested in [Brewster's] expression." *Roe,* 109 F.3d at 585.

A number of balancing considerations weigh in favor of the school officials, however. First, courts have found it significant when employee expression disrupts harmony among co-workers. *See Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Hyland v. Wonder,* 972 F.2d 1129, 1139 (9th Cir.1992). Here, although the district court deemed the disruption of co-worker relations "minor," it cannot be doubted that Brewster's allegations engendered some intra-school disharmony. Indeed, Ida Carbajal, the school secretary in charge of attendance accounting, stated that Brewster's charges were "hurtful" and "proved to [her] that [she] could not trust" Brewster. Of course, Carbajal's "hurt feelings" cannot be determinative of the balance; nevertheless, the existence of a "personality

conflict[ ]" between school employees is a relevant consideration. *See Nicholson v. Board of Education*, 682 F.2d 858, 865–66 (9th Cir.1982); *see also Connick*, 461 U.S. at 151, 103 S.Ct. 1684 (considering office morale and potential disharmony as relevant to *Pickering* calculus). Second, Brewster specifically conceded that "the relationship between teacher and principal is a close working relationship with frequent contact and requires trust and respect in order to be successful." This is precisely the type of employment relationship with respect to which the Supreme Court has concluded that "a wide degree of deference to the employer's judgment is appropriate." *Connick*, 461 U.S. at 151–52, 103 S.Ct. 1684. Third, courts have also considered as relevant to the *Pickering* determination that an employee's speech interferes with the fulfillment of his own office duties. *See Rankin*, 483 U.S. at 388, 107 S.Ct. 2891; *Hyland*, 972 F.2d at 1139. In *Rendish v. City of Tacoma*, 123 F.3d 1216 (9th Cir.1997), we specifically recognized that an employee's "lack of trust and confidence" in his employer—such as that demonstrated by Brewster toward the District with regard to its attendance reporting—held the danger of compromising his on-the-job performance. *See id.* at 1225. Fourth, it is significant in weighing the relevant interests that Brewster's speech "was not directed to the public or the media, but rather to a governmental colleague." *Roe*, 109 F.3d at 585. Although the private nature of the statement does not remove it from the realm of "public concern" altogether, *see Rankin*, 483 U.S. at 387 n. 11, 107 S.Ct. 2891, we have acknowledged that a "narrow, limited focus and [a] limited audience weigh against [a] claim of protected speech." *Roe*, 109 F.3d at 585.[4] Finally, weighing against Brewster's claim is the fact that, despite their public-concern character, Brewster's allegations of erroneous record-keeping were ultimately determined to be false, both by Furuno and by a team of

independent auditors. *See Johnson v. Multnomah County*, 48 F.3d 420, 424 (9th Cir. 1995) ("[T]he falseness of the statements [at issue] should be considered ... as part of the *Pickering* balance.").

On the merits, the question whether Brewster's speech was protected by the First Amendment is perhaps a close one. After all, both parties can point to important interests supporting their respective sides of the *Pickering* balance. Moreover, the relevant cases do not lead us inexorably to a single conclusion; quite the contrary, they point in opposite directions. *Compare, e.g., Waters*, 511 U.S. 661, 114 S.Ct. 1878 (favoring the employer), *Connick*, 461 U.S. 138, 103 S.Ct. 1684 (same), *Rendish*, 123 F.3d 1216 (same), *Weisbuch v. County of Los Angeles*, 119 F.3d 778 (9th Cir.1997) (same), *Nelson v. Pima Community College*, 83 F.3d 1075 (9th Cir. 1996) (same), *Voigt*, 70 F.3d at 1552 (same), *Wheaton v. Webb–Petett*, 931 F.2d 613 (9th Cir.1991) (same), and *Nicholson*, 682 F.2d 858 (same) *with, e.g., Rankin*, 483 U.S. 378, 107 S.Ct. 2891 (favoring the employee), *Pickering*, 391 U.S. 563, 88 S.Ct. 1731 (same), and *McKinley v. City of Eloy*, 705 F.2d 1110 (9th Cir.1983) (same).

Thankfully, we need not definitively resolve the merits at this stage. Rather, we are faced with the "much simpler task," *Moran*, 147 F.3d 839, slip op. at 5339, of deciding whether the *Pickering* test so clearly favors Brewster that it would have been unreasonable for the officials to believe that Brewster's nonreelection was lawful. *See Romero*, 931 F.2d at 627. In view of the competing considerations on each side of the *Pickering* balance and the absence of specific direction from the relevant case law, it would, we think, be dubious indeed to conclude that Brewster's right to speak was sufficiently "clearly established" to defeat the school officials' assertion of qualified immunity. We therefore reverse the district court's denial of

---

4. The *Roe* court was speaking in the context of evaluating whether the speech there at issue touched on a matter of "public concern" rather than in the context of balancing private and governmental interests. However, the *Pickering* test is a "true" balancing test—that is, "the state's burden in justifying a particular discharge

varies depending upon the nature of the employee's expression." *Connick*, 461 U.S. at 150, 103 S.Ct. 1684. Consequently, the degree to which the speech involves a matter of public concern— the "publicness" of the speech, so to speak—is directly relevant to the *Pickering* balance.

qualified immunity with respect to Brewster's free speech claims.[5]

## B

Brewster also maintains that the school officials violated his procedural due process rights when they unilaterally reduced his salary and then retroactively withheld money from his paychecks in order to recoup what they believed to be prior overpayments. The officials counter by arguing, first, that Brewster had no protectable "property interest" in his initial placement on the salary schedule because the placement was incorrect and, second, that even if Brewster did possess a property interest in his initial salary, he was afforded all the process that he was constitutionally due.[6]

A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections. In seeking to defeat a claim of qualified immunity, the plaintiff bears the burden of proving not only that both elements of his claim are resolved in his favor, but also that both elements are "clearly established" in his favor. *See Davis,* 468 U.S. at 197, 104 S.Ct. 3012.

## 1

To state a claim under the Due Process Clause, a plaintiff must first establish that he possessed a "property interest" that is deserving of constitutional protection. *See Gilbert v. Homar,* 520 U.S. 924, 117 S.Ct. 1807, 1811, 138 L.Ed.2d 120 (1997). In its order, the district court rejected the officials' factual contention that Brewster was incorrectly placed at Step 15 initially and could not, therefore, possess a protected property interest in his initial salary. Rather, assuming the disputed facts in the light most favorable to Brewster, the court found, for the purposes of summary judgment, "that the District properly placed Brewster on the salary schedule when [he] started working at Will Rogers in September." It went on to conclude, without elaboration, that "[i]f the placement was proper, Brewster had a protectable property interest in the salary."

In *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court explained the source and nature of constitutionally cognizable property interests:

> Property interests ... are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* at 577, 92 S.Ct. 2701. In order to possess a property interest in a benefit, an individual must have more than "an abstract need or desire for it" or "a unilateral expectation of it." Rather, he must possess "a legitimate claim of entitlement to it." *Id.*

In seeking to demonstrate a protected property interest, there are two potential sources of entitlement to which Brewster might point. First, it is not inconceivable that Brewster's employment contract—which stated that "Your starting salary will be Group V–M, Step 15, plus benefits"—created a property interest in his original salary. A second possible source might be § 45028 of the California Education Code, which provides that public school teachers "shall be classified on the salary schedule on the basis of uniform allowance for years of training and years of experience." Cal. Educ.Code § 45028. For the purposes of this appeal, we shall simply assume, without deciding, that—by virtue of either his contract or § 45028—Brewster enjoyed a protected property interest in his original salary placement, and that

---

**5.** Because we conclude that *no* official violated *any* of Brewster's clearly established First Amendment rights, we need not consider the argument that there is insufficient evidence to support a § 1983 claim against Jenkins, Clarke, or the individual members of the Board of Education.

**6.** The officials also maintain that the District did not, in fact, retroactively reduce Brewster's salary. However, the district court concluded, as a factual matter, that the District did recoup overpayments. Consequently, for the purposes of this appeal, we too must assume that a retroactive reduction in salary did occur.

the safeguards of the Due Process Clause are therefore in play.

## 2

"In order to state a claim under the fourteenth amendment, the complainant must allege facts showing not only that the State has deprived him of a ... property interest but also that the State has done so without due process of law." *Gearhart v. Thorne,* 768 F.2d 1072, 1073 (9th Cir.1985) (quoting *Marrero v. City of Hialeah,* 625 F.2d 499, 519 (5th Cir.1980)) (internal quotation marks omitted). Consequently, once a court determines that a protected property interest has been taken, "the question remains what process is due." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

The question of "what process is due" is more easily asked than answered. As the Supreme Court has frankly acknowledged, "[f]or all its consequence, 'due process' has never been, and perhaps never can be, precisely defined." *Lassiter v. Department of Social Servs.,* 452 U.S. 18, 24, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). Rather, the phrase "expresses the requirement of 'fundamental fairness,' a requirement whose meaning can be as opaque as its importance is lofty." *Id.* As a result, deciphering and applying the Due Process Clause is, at best, "an uncertain enterprise." *Id.*

 Precisely what procedures the Due Process Clause requires in any given case is a function of context. After all, "unlike some legal rules," due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria & Restaurant Workers Union v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) (quoting *Joint Anti–Fascist Committee v. McGrath,* 341 U.S. 123, 162, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)) (quotation marks omitted). Rather, it "is flexible and calls for such procedural protections as the particular situation demands." *Morrissey,* 408 U.S. at 481, 92 S.Ct. 2593. As this court has observed, "[t]he determination of what procedures satisfy due process [in a given situation] depends upon an analysis of the particular case

in accordance with the three-part balancing test outlined in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)." *Orloff v. Cleland,* 708 F.2d 372, 378–79 (9th Cir.1983) (parallel citations omitted). In *Mathews,* the Supreme Court stated:

[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors. First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Mathews,* 424 U.S. at 335, 96 S.Ct. 893.

"While the right to due process is 'clearly established' by the Due Process Clause, this level of generality was not intended to satisfy the qualified immunity standard." *Sinaloa Lake Owners Ass'n v. City of Simi Valley,* 70 F.3d 1095, 1100 (9th Cir.1995). Rather, courts must look to the *Mathews* test. And, as is the case with respect to public-employee free speech claims, *see supra* Part III.A.2., because procedural due process analysis essentially boils down to an ad hoc balancing inquiry, the law regarding procedural due process claims "can rarely be considered 'clearly established' at least in the absence of closely corresponding factual and legal precedent." *Baker v. Racansky,* 887 F.2d 183, 187 (9th Cir.1989) (quoting *Myers v. Morris,* 810 F.2d 1437, 1462 (8th Cir.1987)) (internal quotation marks omitted). Indeed, without specific direction from cases applying it, the *Mathews* standard is perhaps even less amenable to the discovery of clearly established law than are the *Pickering* test and other multifactor balancing tests that arise in constitutional jurisprudence. Not only does the *Mathews* inquiry require a delicate balancing of several competing interests, it requires that balancing at several separate stages of the procedural due process calculus. First, courts employ the *Mathews* balance to determine whether an individual is entitled to a predeprivation (as opposed to postdepriva-

tion) hearing. *See, e.g., Zinermon v. Burch,* 494 U.S. 113, 127–29, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). Second, courts look to *Mathews* in determining the specific procedures that the hearing (whether pre- or post-deprivation) should entail. *See, e.g., Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 16–19, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978). Finally, if a court determines that a formal adversarial hearing is required, it will consult the *Mathews* standard in establishing the appropriate standard of proof that the government must meet. *See, e.g., Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). The result of combining the *Mathews* test's ambiguity with its ubiquity is unsurprising: "[O]ne cannot accurately predict how any specific case will be decided." Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* § 17.8, at 663 (2d ed.1992).

As with Brewster's First Amendment claims, notwithstanding the fact that procedural due process rights oftentimes will not be "clearly established" within the meaning of *Harlow* and *Anderson,* we must consider the specific facts of this case to determine whether it presents one of those occasions in which the rights are clearly established. The question presented therefore boils down to this: Has Brewster proven that, under the three-part balancing analysis of *Mathews* and the precedents that have applied it, he had a "clearly established" right to process more comprehensive than that provided by the District?

■ The base requirement of the Due Process Clause is that a person deprived of property be given an opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). The precise timing of a hearing—whether it must be before or instead may be after the alleged property deprivation has occurred— is, of course, a function of the nebulous *Mathews* balance. And although the Supreme Court has held that an individual should normally be given notice and an opportunity to be heard *before* he is deprived of his property, *see United States v. James Daniel Good Real Property,* 510 U.S. 43, 48,

114 S.Ct. 492, 126 L.Ed.2d 490 (1993), that rule is assuredly not hard and fast. *See Parratt v. Taylor,* 451 U.S. 527, 540, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) ("[W]e have rejected the proposition that [due process] always requires the State to provide a hearing prior to the initial deprivation of property."), *overruled in part on other grounds by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Rather, when countervailing interests require it, the State may dispense with predeprivation process. For instance, "[a]n important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation." *FDIC v. Mallen,* 486 U.S. 230, 240, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988).

■ In recent years, the Supreme Court has extended the reach of this so-called "exception" considerably, and has held on a number of occasions that post-deprivation process alone satisfies the Due Process Clause. For instance, in *Mallen,* 486 U.S. 230, 108 S.Ct. 1780, the Court held that the FDIC's interest in immediately suspending indicted bank officers outweighed the officers' interest in retaining their positions and therefore justified dispensing with predeprivation process. *See id.* at 241, 108 S.Ct. 1780. Similarly, in *Barry v. Barchi,* 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), the Court concluded that a State's interest in protecting the integrity of the sport of horseracing trumped horse trainers' interest in avoiding suspension and thus warranted a postponement of hearings. *See id.* at 64–65, 99 S.Ct. 2642. In the instant case, the District's interest in halting what it believed to be substantial overpayments to Brewster— payments that indirectly affected citizens' tax liability and that might have been difficult to recover after the fact—is at least as compelling as the interest in preserving the integrity of the sport of horseracing. *See Mallen,* 486 U.S. at 241, 108 S.Ct. 1780 (using State's interest in protecting integrity of horseracing as baseline for measuring other state interests). On the other side of the balance,

Brewster's interest in maintaining a particular salary grade is less weighty than—and hence entitled to less deference than—the significant private interest at issue in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), the interest in avoiding. permanent dismissal from a tenured position. *Cf. Gilbert*, 117 S.Ct. at 1813 ("Unlike the employee in *Loudermill*, who faced termination, respondent faced only a temporary suspension without pay."). Accordingly, it would not have been unreasonable, *see Romero*, 931 F.2d at 627, for District officials to conclude, in view of the most relevant cases, that in Brewster's situation, the *Mathews* balance did not clearly weigh in Brewster's favor and, consequently, that predeprivation process was not constitutionally required.

Even if a predeprivation hearing *were* clearly required on these facts, the officials would nonetheless be entitled to qualified immunity because it is ·not clear, under *Mathews*, that the predeprivation process that Brewster received fell below the constitutional minimum. The Supreme Court has made clear that in circumstances in which a predeprivation hearing is required by due process, it "need not be elaborate." *Loudermill*, 470 U.S. at 545, 105 S.Ct. 1487. The hearing need not even approximate a trial-like proceeding; in fact, it may be "very limited" and still pass constitutional muster. *Gilbert*, 117 S.Ct. at 1811. A predeprivation hearing serves only as "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges are true and support the proposed action." *Loudermill*, 470 U.S. at 545–46, 105 S.Ct. 1487. To that end, a plaintiff need only be accorded "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* at 546, 105 S.Ct. 1487.

On the facts of this case, Brewster received predeprivation process that was more than constitutionally adequate. Prior to *any* action being taken with regard to his salary, Brewster was notified in writing on two separate occasions. First, on December 2, 1994, Brewster received a memorandum from Jenkins explaining that the District had received verification of only three years of teaching experience and that unless additional verification was received by December 9, Brewster's salary would be reduced. The memorandum also alerted Brewster to the fact that the reduction recommendation would be submitted to the Board of Education at its meeting on December 13. Brewster received a virtually identical memorandum from Jenkins on December 7. Significantly, both memoranda specifically solicited Brewster's input: "If you have any questions regarding this matter, please contact the certificated personnel office." When additional verification was not received, the Board took preliminary steps to reduce Brewster's salary on December 13.

Subsequent to the Board's action, on December 15, Brewster met with Jenkins to discuss the salary reduction. He was accompanied by his union representative, Wiley Jones. During the meeting, Jenkins indicated that she was willing to change her initial position and to prevent the reduction of Brewster's salary if Brewster could demonstrate that the District had previously awarded salary-schedule credit for non-teaching experience. Brewster does not dispute that he "was given an additional opportunity to present evidence supporting his claim for additional experience credit" and that, to that end, he informed Jenkins that he believed a woman named Rosemary Carrillo had received administrative-experience credit. On January 9, 1995, after reviewing Carrillo's personnel records, Jenkins advised Brewster that Carrillo had not received such credit, and confirmed the reduction of Brewster's salary.

Obviously, Brewster did not suffer a *final* deprivation of his property until January 9, 1995. Until that date, his place on the salary scale remained uncertain. Regardless of the Board's decision, had Jenkins concluded that Brewster's allegations regarding Carrillo were correct, Brewster would have retained his Step–15 pay. Both the Supreme Court and this court have held that a predeprivation hearing, where required, need only take place before an individual is "finally" deprived of a property interest. *See Parratt,*

451 U.S. at 539–40, 101 S.Ct. 1908; *Mathews,* 424 U.S. at 332, 96 S.Ct. 893; *Gearhart,* 768 F.2d at 1073. Consequently, because Jenkins ultimately held the key to Brewster's salary-scale placement, January 9, the date of Jenkins's final decision—and not December 13, the date of the Board meeting—is the relevant date for evaluating the constitutional sufficiency of Brewster's predeprivation process. Viewed in that light, it seems to us beyond dispute that the process provided by the District more than satisfied constitutional requirements. Not only was Brewster informed of the nature of the "charges" against him and given ample opportunity to respond, *see Loudermill,* 470 U.S. at 546, 105 S.Ct. 1487, he was permitted a counseled, face-to-face confrontation with Jenkins and was invited to present evidence on his own behalf. Under no reasonable interpretation of the relevant precedents could it be claimed that the process provided violated any of Brewster's clearly established due process rights.

Moreover, even were we to assume that Brewster was actually deprived of his rightful salary by the Board's action on December 13, instead of on January 9, the process that he was afforded nonetheless satisfied the rather meager requirements that the Supreme Court has established for predeprivation hearings. *See Gilbert,* 117 S.Ct. at 1811. In *Loudermill,* a case involving the discharge of several tenured state employees, the Court held that a constitutionally adequate predeprivation hearing consisted of only three elements: (1) oral or written notice to the employee of the "charges" against him; (2) an explanation of the employer's evidence; and (3) an opportunity to respond, either in person or in writing. *See Loudermill,* 470 U.S. at 546, 105 S.Ct. 1487. In judging the sufficiency of the process accorded Brewster, we must, of course, recognize that, unlike Loud-

ermill, Brewster had not been threatened with immediate termination, only a reduction in salary. Consequently, the first prong of the *Mathews* test—the private interest affected—is slightly less weighty in Brewster's case than in Loudermill's. As a result, Brewster was entitled to marginally less process than was Loudermill. *See Mathews,* 424 U.S. at 335, 96 S.Ct. 893.

Together, the two memoranda—dated December 2, 1994, and December 7, 1994—fulfilled the requirements of due process. Both memoranda notified Brewster that the District had not received necessary experience verification. Both informed Brewster that if the verification was not received by December 9, his salary would be reduced. Finally, and most significantly, both expressly offered Brewster the opportunity to respond to the allegations. Pursuant to *Loudermill* and *Mathews,* that is all that is required at the predeprivation stage. Immediately after the Board's decision, Brewster was given a personal audience with Jenkins.[7] Although there is no specific formula for what procedures a postdeprivation hearing must entail, it is significant that, at the meeting, Brewster was accompanied by a counsel-like figure, his union representative, and was also permitted to present evidence and to confront Jenkins, his "accuser." *See Vanelli v. Reynolds Sch. Dist. No. 7,* 667 F.2d 773, 779–80 (9th Cir.1982).[8]

Consequently, whether one assumes that the "deprivation" occurred on December 13, 1994, or on January 9, 1995, the procedures provided by the District satisfied the dictates of due process. At the very least, they were not so clearly insufficient as to deprive the District officials of qualified immunity.[9] It would not, in the words of the

---

**7.** Brewster does not challenge the promptness of the hearing with Jenkins. Nor could he. *See Mallen,* 486 U.S. at 242, 108 S.Ct. 1780 (approving delay of 90 days prior to postdeprivation hearing).

**8.** Brewster does not allege that Jenkins was not an impartial decisionmaker. *See Clements v. Airport Authority,* 69 F.3d 321, 332 (9th Cir.1995).

**9.** The only relevant case cited by Brewster for the proposition that the process he received was

constitutionally insufficient is *Sanchez v. City of Santa Ana,* 915 F.2d 424 (9th Cir.1990). There is, however, a crucial distinction between this case and *Sanchez.* In *Sanchez,* the plaintiff "received no hearing or an opportunity to be heard *at any time." Id.* at 430 (emphasis added). Presumably, when an individual is given neither a predeprivation hearing nor a postdeprivation hearing at which to contest the taking of his property, his clearly established due process rights *have* been violated, because under no reading of *Mathews* could such a taking be constitu-

Supreme Court, have been "unreasonable in this case, under Fourteenth Amendment due process principles, for the [officials] to conclude that [Brewster] had been provided with the fundamentals of due process." *Davis,* 468 U.S. at 192, 104 S.Ct. 3012. We therefore reverse the district court's denial of qualified immunity with respect to Brewster's procedural due process claims.[10]

## IV

In *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), the late Justice Brennan lamented the proliferation of so-called "balancing tests" in constitutional jurisprudence, warning that the freewheeling multifactor inquiries would pave the road to "doctrinally destructive nihilism." *Id.* at 369, 105 S.Ct. 733 (Brennan, J., concurring in part and dissenting in part). Nowhere is Justice Brennan's observation more apropos than in the realm of qualified immunity, in which "clearly established" law reigns supreme. And nowhere is the uncomfortable coexistence of balancing tests and *Harlow*'s "clearly established rights" standard more apparent than in this case, in which a plaintiff laid claim to two separate constitutional rights, each of which depends upon an ad hoc weighing of competing interests.

Because we conclude that neither Brewster's First Amendment rights under *Pickering* nor his procedural due process rights under *Mathews* were "clearly established," as required by *Harlow,* the school officials are entitled to immunity from monetary damages.

**REVERSED.**

tional. In that case, the offending officials would not be entitled to qualified immunity. That case, however, is not this case.

**10.** As is the case with regard to the First Amendment claims, *see supra* note 5, because we conclude that *no* official violated *any* of Brewster's

clearly established procedural due process rights, we need not consider the argument that there is insufficient evidence to sustain a claim against Furuno, Clarke, or the individual members of the Board of Education.