**John ROE, Plaintiff–Appellant,**

v.

**CITY AND COUNTY OF SAN FRANCISCO; Donna Lee; Arlo Smith, Defendants–Appellees.**

No. 96–15590.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 13, 1997.

Decided March 24, 1997.

Paul Kleven, Law Offices of Paul Kleven, Berkeley, California, for plaintiff-appellant.

Kimon Manolius, Deputy City Attorney, San Francisco, California, for defendants-appellees.

Before: SNEED, LEAVY and THOMAS, Circuit Judges.

THOMAS, Circuit Judge.

California State Police Officer John Roe seeks damages and injunctive relief for the refusal of the City and County of San Francisco to prosecute his cases without corroborating evidence, allegedly in retaliation for his exercise of free speech. The district court granted summary judgment. We affirm.

## BACKGROUND

John Roe is a fictitious name for a California Police Officer who worked primarily in San Francisco from 1990 to 1993. In July 1993, Officer Roe observed a suspect smoking marijuana. He conducted a search, found methamphetamine and executed an arrest. Assistant District Attorney Louis Lipsett dismissed the case because he believed Roe's search and questioning of the suspect had been improper. Roe disagreed and discussed the matter with Supervising District Attorney Donna Lee, then in charge of the narcotics prosecution unit. Ms. Lee told Roe she agreed with the decision to dismiss and that Roe's legal analysis was incorrect. However, she promised to do further research and get back to him. On August 2, 1993, Roe wrote Lee a memorandum which stated:

> After our conversation of last month, I spent some time and researched the issues we discussed. Frankly, I have more spare

time than you probably do, so I compiled some cases for you.

As I stated earlier, I can understand your office's decision not to file criminal charges in the *JAFARINEJAD* case, in the interest of justice.

I have attached some case cites for your perusal. In the event another officer makes an arrest with similar search circumstances, and the case is worth pursuing, this may save you some time in preparing for any motion to suppress that may be filed by the defense.

Please contact me when you get this. I have copies of the actual cases and can get these to you if you would like.

Attached to the memo were legal questions and case summaries which appeared to be from prepared materials. Roe contends his purpose "was to assist the recipients in the event that a similar situation arose in the future regarding these search and seizure issues."

According to affidavits submitted by Roe, Lee became annoyed upon receiving the memo and stated to third parties that it was unusual to receive a legal opinion from a police officer and that she believed Roe was trying to "show her up."

Later that August, Lee refused to prosecute another case investigated by Roe. After seizing contraband narcotics, Roe had retained the narcotics for four hours to perform his own testing before he sent the evidence to the criminal laboratory. Lee believed this to be an irregular procedure from which a jury might infer that Roe had tampered with the evidence.

In late September, Assistant District Attorney John Farrell dismissed one of Roe's cases in midtrial because Farrell thought Roe had "lied under oath." Farrell believed that Roe's version of the arrest at trial was different from his testimony at two prior pretrial hearings. When Farrell pointed out these inconsistencies to Roe after his direct examination and asked Roe what really happened, Roe responded that he could not remember. Roe felt the inconsistencies were minor and attributable to Farrell's refusal to

provide him with a transcript of the prior proceedings.

Farrell subsequently discussed the dismissal with Criminal Division Chief Linda Klee. She told Farrell that she agreed with the decision not to go forward with untruthful testimony. Klee wanted to review the relevant transcripts personally and requested that Farrell prepare a memo detailing his observations.

On October 4, 1993, Farrell sent the requested memo to Lee and Klee stating, in relevant part:

On September 23, 1993, I dismissed our case against Richard Dillon after the completion of the arresting officer's direct examination. I dismissed the case because the officer's testimony was not credible. I did not think the officer was telling the truth.

. . . .

I was disturbed over the officer's conflicting versions of events, especially since he had been so specific and so sure of his testimony each time. Each version appeared to be constructed to advance the officer's cause.

The version given at trial seemed designed to help prove the key issue at trial: whether the defendant knew that there was methamphetamine in the knapsack. The version given at the motion to suppress hearing appeared to be altered to overcome a wrong-headed issue raised in the defendant's moving papers: that the officer improperly questioned the defendant who was in custody about drugs and that this questioning is what led to the discovery of the drugs.

. . . .

Officer [Roe] worked hard on preparing for this trial and showed dedication in his work. I believe, however, that he was overzealous and tailored his testimony at different stages of the proceedings because he thought it would help our prosecution of this case. That tailoring of testimony resulted in the dismissal of charges against Richard Dillon.

When he authored the memo and dismissed the case, Farrell did not know of Roe's prior communication to Lee.

Klee reviewed the transcripts and concluded "we had an officer who was telling a lie." She instructed Farrell to inform Roe's supervisors. Subsequently, Lee requested Klee's guidance on how Roe's future cases should be handled. Klee informed Lee she should require corroboration, consistent with the procedure used in a similar situation involving questionable testimony from a security guard. Klee testified that at this time, she was not aware of Roe's prior communication with Lee.

These events resulted in an internal investigation by the California State Police and Roe's temporary transfer to Oakland. At the conclusion of the investigation, California State Police Chief Duane Lowe wrote District Attorney Arlo Smith on May 24, 1994 in relevant part:

We discovered inconsistent testimony given by [Roe] at different stages of his testimony. [Roe] acknowledged that he failed to bring his reports and notes to the trial court. He states that Farrell refused to permit him to review previous testimony and he later informed Farrell that he could not remember exactly what happened. While it is my position that any deliberate misrepresentation or intentional dishonesty when testifying in court is not only illegal but also totally unacceptable, after close evaluation, we were unable to sustain that he intentionally lied about what had occurred. It is my understanding that a number of prosecutors in your office acknowledge they have experienced no problem with [Roe's] testimony in other cases where he was involved.

We have been informed that Donna Lee is now refusing to file a case in which [Roe] is the arresting officer. . . . My I.A. Commander, Lieutenant Les Stuhr, spoke on the telephone with Linda Klee and she informed Stuhr that a memo has been circulated or distributed in the District Attorney's office by a member of your staff which states that [Roe] lied on the witness stand and because of such a memo, they are compelled to notify the Defense in any

case where [Roe] is to testify. She also informed Stuhr that [Roe] should leave San Francisco because the problem will never go away!

Lowe urged District Attorney Smith to review the case and to interview Roe. Chief Lowe also inquired as to the District Attorney's Office official policy concerning the filing of Roe's cases.

Because the investigation had concluded, Roe was transferred back to San Francisco. Lee refused to file any cases referred by Roe absent additional corroborating evidence or testimony.

On June 16, 1994, the principals conferred to discuss the situation. Attending were District Attorney Smith, Supervising District Attorney Lee, Chief Assistant District Attorney Robert Podesta, Officer Roe, California State Police Commander Byrd, California State Lieutenant Stuhr and Roe's attorney. Roe testified that "[i]nitially, they said that they weren't going to file any of the cases, because they were bound to disclose Mr. Farrell's memorandum to defense counsel. . . . From there is where they changed to the corroboration thing." Roe requested that the District Attorney rescind the policy. No decisions were made at the meeting.

Subsequently, Smith informed the California State Police that there would be no change in policy and no prosecutions of Roe's cases would be made without corroborating evidence. On July 29, 1994, California State Police Deputy Chief Michael Vega reassigned Roe to Oakland, noting:

The San Francisco District Attorney's Office has placed restrictions and conditions on your ability to provide testimony on criminal cases in the San Francisco County court system. As such, you will be unable to fully complete your duties as a State Police Officer.

Roe then filed this action seeking equitable and monetary relief in state court against Lee, Smith, the City and County of San Francisco and John Does 1–30, claiming, *inter alia,* that the defendants had retaliated against him for the circulation of the legal memorandum in violation of his right to free speech. Defendants removed the case to

federal district court on federal question jurisdiction. From the district court's grant of summary judgment, Roe appeals.

## STANDARD OF REVIEW

We review a grant of summary judgment de novo. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996). Summary judgment is appropriate when the movant shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2511.

## ANALYSIS

### I. IMMUNITY FOR THE INDIVIDUAL PROSECUTORS

■ Prosecutors are "absolutely immune from liability under section 1983 for their conduct in 'initiating a prosecution and in presenting the State's case' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.'" *Burns v. Reed,* 500 U.S. 478, 486, 111 S.Ct. 1934, 1939, 114 L.Ed.2d 547 (1991) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 431, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976)) (internal citations omitted). However, when prosecutors perform "administrative or investigative, rather than advocatory, functions they do not receive absolute immunity." *Fletcher v. Kalina,* 93 F.3d 653, 655 (9th Cir.1996).

■ To determine whether an action was judicial, administrative, or investigative, "[w]e look at 'the nature of the function performed, not the identity of the actor who performed it.'" *Id.* (quoting *Forrester v. White,* 484 U.S. 219, 229, 108 S.Ct. 538, 545, 98 L.Ed.2d 555 (1988)).

■ Although it is well established that a prosecutor has absolute immunity for the decision to prosecute, *see Burns,* 500 U.S. at 486, 111 S.Ct. at 1939; *Fletcher,* 93 F.3d at 654, the question of whether a prosecutor enjoys absolute immunity for the decision not to prosecute is a question of first impression in this circuit. However, we have little difficulty in concluding affirmatively on this issue. Indeed, public policy considerations make an even stronger argument for absolute immunity for failure to prosecute than for actual prosecution. The decision to charge a defendant with a crime may well be the most critical determination in the entire prosecutorial process. That decision alone may result in the loss of a defendant's freedom pending trial and certainly will confront him or her with the economic and social costs of a trial. There can be no question that the nature of the decision not to prosecute is "intimately associated with the judicial phase of the criminal process." Therefore, consistent with our sister circuits, we hold that a prosecutor is entitled to absolute immunity for the decision not to prosecute. *See Harrington v. Almy,* 977 F.2d 37 (1st Cir.1992); *Oliver v. Collins,* 904 F.2d 278 (5th Cir.1990); *Schloss v. Bouse,* 876 F.2d 287 (2d Cir.1989); *Meade v. Grubbs,* 841 F.2d 1512 (10th Cir. 1988).

Roe claims that even if absolute immunity exists for the typical, single-case situation in which a disgruntled victim resents the prosecutor's failure to prosecute, absolute immunity should not exist for a decision involving a whole line of cases, such as the decision made here of not prosecuting any of an officer's unwitnessed arrests.

This argument is unpersuasive. In analyzing the rational underpinnings of absolute prosecutorial immunity in this context, there is "no meaningful distinction between a decision on prosecution in a single instance and decisions on prosecutions formulated as a policy for general application." *Haynesworth v. Miller,* 820 F.2d 1245, 1269 (D.C.Cir.1987). "Both practices involve a balancing of myriad factors, including culpability, prosecutorial resources and public interests" and "both procedures culminate in initiation of criminal proceedings against par-

ticular defendants, and in each it is the individual prosecution that begats the asserted deprivation of constitutional rights." *Id.*

 In this instance, the prosecutors allege that Roe is not a credible witness. They do not believe they can prosecute his cases without corroborating evidence in good conscience or with a reasonable expectation of winning a conviction. Whether their assessment is accurate or not is immaterial. This kind of witness evaluation falls entirely within a prosecutor's judicial function regardless of whether one case or a line of cases is at issue. Just as a prosecutor's professional evaluation of the evidence assembled by the police is entitled to absolute immunity, *Buckley v. Fitzsimmons,* 509 U.S. 259, 273, 113 S.Ct. 2606, 2615, 125 L.Ed.2d 209 (1993), a prosecutor's professional evaluation of a witness is entitled to absolute immunity even if that judgment is harsh, unfair or clouded by personal animus, as Roe alleges here.

We agree with the First Circuit, which decided the issue presented here by Roe in favor of absolute immunity. In *Harrington v. Almy,* 977 F.2d 37 (1st Cir.1992), a police officer was accused of sexually molesting four children. The accusations became heavily discredited; the children ended up accusing over 170 people of abusing them. *Id.* at 39. However, the district attorney refused to file any of the police officer's cases unless the police officer submitted to a highly intrusive procedure, called a penile plethysmograph. *Id.* In finding that the prosecutor was entitled to absolute immunity, the First Circuit observed that "the crucial discretionary decision a prosecutor makes in the judicial system is whether to charge." *Id.* at 40. The First Circuit also noted the importance of absolute immunity "for the decision not to charge," because of the danger a decision to prosecute would be influenced by a fear of liability for failing to prosecute. *Id.* at 41 (emphasis deleted).

Roe also argues that under *Imbler* and *Buckley,* a tradition in the common law for immunity is a prerequisite for absolute immunity. *Imbler,* 424 U.S. at 421, 96 S.Ct. at 990; *Buckley,* 509 U.S. at 274 n. 5, 113 S.Ct. at 2616 n. 5. He maintains that no such common law immunity exists for refusing to prosecute an officer's cases. Roe reads *Imbler* and *Buckley* too broadly. Certainly, both *Imbler* and *Buckley* contain language emphasizing that the justification for allowing absolute immunity to section 1983 actions rests on the existence of common law immunities. Nonetheless, the function test has emerged as the method by which a court determines if an action is within the judicial phase of the criminal process, for which common law immunity exists. *See Forrester,* 484 U.S. at 229, 108 S.Ct. at 545; *Fletcher,* 93 F.3d at 655. Applying this test, we have concluded that a prosecutor acts in a quasi-judicial capacity in initiating a prosecution and presenting the state's evidence. *Ashelman v. Pope,* 793 F.2d 1072, 1076 (9th Cir. 1986) (en banc). Thus, because a prosecutor's decision not to prosecute is unquestionably within the judicial phase of the criminal process, absolute immunity exists.

Accordingly, we hold that absolute immunity exists against damage suits against individual prosecutors under 42 U.S.C. § 1983 for decisions not to initiate prosecutions. Because we have concluded that absolute immunity applies, we need not decide whether the prosecutors are entitled to qualified immunity.

## II. GOVERNMENTAL LIABILITY

Although the district court determined that absolute liability shielded the City and County of San Francisco as well as the individual prosecutors, the government defendants surprisingly abandoned that contention on appeal. Thus, we turn to the merits of Roe's First Amendment claim.

 In evaluating the First Amendment rights of a public employee, the threshold inquiry is whether the statements at issue substantially address a matter of public concern. *Allen v. Scribner,* 812 F.2d 426, 430 (9th Cir.1987). Although necessarily driven by facts of a particular case, this determination is one of law for the court. *Chateaubriand v. Gaspard,* 97 F.3d 1218, 1222 (9th Cir.1996).

 Public employee speech on matters of public concern merits the highest degree of First Amendment protection. *McKinley*

*v. City of Eloy,* 705 F.2d 1110, 1114 (9th Cir.1983). Public employee speech is "of public concern" if it helps citizens "to make informed decisions about the operation of their government." *Id.*

Speech by public employees may be characterized as not of public concern when it "deals with individual personnel disputes and grievances" and when that information "would be of no relevance to the public's evaluation of the performance of governmental agencies." *Id.* In other words, the content of the communication must be of broader societal concern. The focus must be upon whether the public or community is likely to be truly interested in the particular expression, or whether it is more properly viewed as essentially a private grievance. *Berger v. Battaglia,* 779 F.2d 992, 999 (4th Cir.1985). This standard does not require the communication to be of global importance or "vital to the survival of Western civilization." To deserve First Amendment protection, it is sufficient that the speech concern matters in which even a relatively small segment of the general public might be interested. *Dishnow v. School Dist.,* 77 F.3d 194, 197 (7th Cir.1996). For this reason, public employee speech reported by the press almost by definition involves matters "of public concern." *Rode v. Dellarciprete,* 845 F.2d 1195, 1202 (3d Cir.1988). "Speech that can fairly be considered as relating to any matter of political, social, or other concern to the community is constitutionally protected." *Gillette v. Delmore,* 886 F.2d 1194, 1197 (9th Cir.1989).

However, if the communication is essentially self-interested, with no public import, then it is not of public concern. Indeed, if the speech concerns information only of personal interest, "a federal court is not the appropriate forum" in which to review the public agency reaction "absent the most unusual circumstances." *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983).

Whether speech addresses a matter of public concern "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. at 1690. Here, even applying this analysis in a manner most favorable to Roe, we find that his communication was not of sufficient concern to the general public to trigger First Amendment scrutiny.

Distilled to its essence, Roe's letter consists of nothing more than a inter-office transmittal of case citations and summaries. His object was not to provoke robust debate of a public issue; his avowed purpose "was to assist the recipients in the event that a similar situation arose in the future regarding these search and seizure issues." His speech was not directed to the public or the media, but rather to a governmental colleague. Although not dispositive, this narrow, technical focus and limited audience weigh against his claim of protected speech. *Johnson v. Multnomah County,* 48 F.3d 420, 425 (9th Cir. 1995)("[T]he employee's motivation and the chosen audience are among the many factors to be considered in light of the public's interest in the subject matter of the speech.")

Roe urges us to construe his letter differently from its plain language. He argues his letter actually addressed search and seizure issues "of vital interest to citizens in evaluating their government" in that a suspected felon would escape prosecution because "Lee had misunderstood the relevant Fourth Amendment law." If Roe's letter had stated just that, his argument would be stronger. However, such a reading is not to be found in his missive. Rather, he wrote Lee that he "understood your office's decision not to file criminal charges ... in the interest of justice" and attached case cites to "save you some time" in preparing for future suppression motions. No message of vital public import lies in this dispatch. Roe's letter addressed purely matters of internal governmental management, unrelated to an issue "beyond the employee's bureaucratic niche." *Tucker v. California Dep't of Educ.,* 97 F.3d 1204, 1210 (9th Cir.1996)(quoting *National Treasury Employees Union v. United States,* 990 F.2d 1271, 1273 (D.C.Cir.1993) *aff'd in relevant part, rev'd in part on other grounds,* 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995)).

That Lee may have taken umbrage at Roe's effort to advise her on search and seizure law similarly is of no moment. An internal dispute with no wider societal implications is not a matter of public concern. Instead, it falls within the genre of "personnel disputes and grievances" which are not constitutionally significant. *McKinley,* 705 F.2d at 1114.

Further, when we view the communication in the context of the entire record, as we must under *Connick,* Roe's claim is further enervated. Both of the primary alleged retaliators, Klee and Farrell, submitted uncontradicted testimony that they had no knowledge of Roe's letter when they committed the challenged acts.

We are mindful of the "dangers of reducing the First Amendment to a series of doctrinal cubbyholes" and "of warping different fact situations to fit into the boxes we have created." *Tucker,* 97 F.3d at 1209. We adhere to a liberal construction of what an issue "of public concern" is under the First Amendment. Yet, as we have recently noted:

> In a close case, when the subject matter of a statement is only marginally related to issues of public concern, the fact that it was made because of a grudge or other private interest or to co-workers rather than to the press may lead the court to conclude that the statement does not substantially involve a matter of public concern.

*Johnson,* 48 F.3d at 425.

Officer Roe has presented us with just such a circumstance. Accordingly, we decline to find that a private transmission of case citations to a prosecutor from a police officer who chooses to remain anonymous constitutes a matter of public concern. Because Roe failed to meet the threshold requirement for a First Amendment retaliation lawsuit, his claim against the City and County of San Francisco fails as a matter of law.

## III. INJUNCTIVE RELIEF AGAINST THE INDIVIDUAL PROSECUTORS

Roe asks us, under both federal and state law, to enjoin the defendants from refusing to prosecute his cases.

The individual prosecutors' absolute immunity protects them only from damages claims, not from suits for prospective injunctive relief. *See Fry v. Melaragno,* 939 F.2d 832, 839 (9th Cir.1991). However, as a general principle, "the separation of powers proscribes a judicial direction that a prosecutor commence a particular prosecution." *Harrington,* 977 F.2d at 41.

We need not reach this issue. Because a First Amendment violation is a *sine qua non* to obtain an injunction in this context, Roe's complaint for injunctive relief also fails as a matter of law.

The judgment of the district court is AFFIRMED.