Glenn **BECK**, Appellant,

v.

Richard **PHILLIPS**, Appellee.

No. 03–0645.

Supreme Court of Iowa.

Aug. 11, 2004.

William H. Roemerman of Crawford, Sullivan, Read & Roemerman, P.C., Cedar Rapids, for appellant.

Christopher L. Bruns of Elderkin & Pirnie, P.L.C., Cedar Rapids, for appellee.

STREIT, Justice.

A county attorney, concluding a police officer had lied to DCI agents concerning his wife's death, told a police chief and a mayor he would not prosecute any cases involving the officer. The officer was fired from two positions, and sued the county attorney for defamation, interference with employment contract, and unlawful dissemination of "intelligence data." The district court dismissed the case, ruling the county attorney was absolutely immune from suit. Because we find the county attorney was not engaged in an activity intimately associated with the judicial phase of the criminal process but instead was merely advising the relevant authorities on how future criminal prosecutions should be conducted, we reverse and remand for further proceedings.

## I. Facts and Prior Proceedings

Glenn and Christel Beck, a married couple, lived in rural Louisa County. Glenn Beck (Beck) worked as a police officer for two Muscatine County towns, West Liber-

ty and Nichols. The present controversy stems from Christel's death at the couple's home in June 1999.

Christel, a quadruple amputee, suffered from a heart condition and depression.[1] She took fourteen different prescription medicines each day, which Beck managed. She had misused these drugs to attempt suicide on a number of occasions. Beck and Christel had openly talked about suicide. Beck claims Christel told him that if he ever found her in a comatose state, he should not call for help, but instead simply "put her back into bed and let her sleep it off."

In May 1999, Christel dragged herself out of bed and managed to knock bottles of her medications off a nearby kitchen table onto the floor. After ingesting a large number of pills, Christel lost consciousness. When Beck discovered her, he did not call for medical assistance but instead waited to see if she would wake up. Christel did not fully recover until three days later.

According to Beck, similar circumstances attended Christel's death. Beck claims he left for work on the evening of June 6, 1999, leaving bottles of pills on the kitchen table again, by accident. Upon returning the next morning, Beck found Christel unconscious—but alive—on the floor in a pool of water. In the water, he also found some partially dissolved pills.

Beck put Christel back in bed. He stayed with her the entire day, but did not call for medical help even though he knew it was possible she might die. Instead, Beck left a message with Christel's visiting nurse in an attempt to convince her not to drop by that day as scheduled. Beck did not want the nurse to come to the house because he knew she would summon help.

When the nurse called back, Beck covered up the voice receiver to create a pause on the phone. Although Beck denied he simulated a conversation with his unconscious wife, he admits that the nurse apparently assumed a conversation was taking place. According to an Iowa Department of Criminal Investigation (DCI) report, the nurse claimed Beck told her Christel had symptoms of the flu and was concerned she would spread the infection to visitors. Thinking she had heard Christel's voice in the background, the nurse agreed to postpone her visit.

Sometime during the day, an aid worker dropped by the Beck home to give Christel a bath. The aid worker saw Christel, but agreed with Beck to pretend that she had never come to the house. They decided to lie if anyone asked.

Christel died later that day. Beck called the authorities, and several agents from the DCI investigated. Beck lied to the agents, telling them that no one had come to visit the house that day. He later recanted.

In December 1999, the Louisa County Attorney informed Beck that he would not be criminally charged in his wife's death. In March 2000, the Louisa County Attorney wrote again, stating that the DCI agents were unhappy with his decision and had pursued the matter with the Attorney General's Office. The Attorney General, however, also decided not to file charges.

Meanwhile, back in the summer of 1999 a DCI agent had told an Assistant Muscatine County Attorney about the investigation into Christel's death and Beck's actions. In spring 2001, the assistant

---

1. Christel lost her limbs after a previous suicide attempt which resulted in her nearly freezing to death.

learned West Liberty had hired Beck as a full-time police officer. Anxious about calling Beck as a witness in prosecutions, the assistant took his concerns to his supervisor, Richard Phillips, the Muscatine County Attorney.

Phillips told the assistant to obtain and review the DCI's investigative files. The assistant became convinced Beck had lied to the DCI and had tried to get others to lie on his behalf. He also thought physical evidence at the crime scene was inconsistent with Beck's version of events and Beck "had not told the DCI agents what really happened."

After consulting his assistants, Phillips wrote, on county attorney letterhead, the following letter to Beck's supervisor at the West Liberty Police Department in July 2001:

Dear Chief Gerstbrein,

This letter will serve to inform you of the serious concerns I have relating to the potential use of Off. Glenn Beck as a witness in prosecutions in Muscatine County. As you may know prosecutors have a specific obligation to disclose certain types of information to defense counsel under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). We are required to disclose evidence favorable to the accused in the criminal case. This information would include evidence that would mitigate the guilt or culpability of the defendant and information that could be used to impeach the credibility of a state's witness. This office is aware of the circumstances surrounding the death of Off. Beck's wife, including Off. Beck's conduct during the investigation. If Off. Beck was called upon to testify in a criminal case we will be forced to reveal to the defense the specifics of his actions in that

matter, including the fact that he lied to DCI special agents during the investigation and that his version of events, if believed, could subject him to prosecution under Iowa Code § 707A.2 [ (assisted suicide) ].

As the chief law enforcement officer for Muscatine County I am obligated to weigh the *Brady/Giglio* requirements set forth above against the potential damage that will be done to a prosecution when the issue becomes Glenn Beck's conduct rather than the defendant's. I will not jeopardize these future prosecutions as the impact on crime victims and the orderly administration of justice would be far too great.

You are therefore informed that this office will not accept for prosecution any case where Off. Beck will be expected to testify. Please govern yourself accordingly.

Very truly yours,

Richard R. Phillips [signed]

Muscatine County Attorney

The next month, Phillips sent a nearly identical letter to the mayor of Nichols, where Beck was also employed part-time as police chief. As a result of Phillips's letters, Beck was fired from both positions.

Beck sued Phillips for defamation, interference with employment contract, and unlawful dissemination of "intelligence data" under Iowa Code chapter 692. The district court granted Phillips's motion for summary judgment. The court ruled Phillips was entitled to absolute immunity for his decision not to prosecute cases where Beck would be a witness.

Beck appealed. Beck maintains the question is *not* whether Phillips is entitled to immunity for his decision not to prosecute, but rather whether some of Phillips's statements in the letter fall outside the scope of this immunity. Beck also argues

his unlawful dissemination of "intelligence data" claim falls outside the scope of the immunity because in enacting chapter 692 the legislature intended to carve out an exception to the general rule of prosecutorial immunity.

Phillips defends the district court ruling for the reasons expressed therein. In the alternative, he contends the ruling may be upheld because (1) Phillips's allegations were true and (2) the unlawful dissemination statute does not provide a cause of action in Beck's case.

## II. Standard of Review

We review a grant of a motion for summary judgment for errors at law. *Estate of Harris v. Papa John's Pizza,* 679 N.W.2d 673, 677 (Iowa 2004). Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.; accord* Iowa R. Civ. P. 1.981(3) (2002).

## III. Merits

### A. The Limits of Absolute Prosecutorial Immunity

We have repeatedly held prosecutors are entitled to absolute immunity for quasi-judicial activities, i.e., activities "intimately associated with the judicial phase of the criminal process." *See Hike v. Hall,* 427 N.W.2d 158, 159 (Iowa 1988) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 995, 47 L.Ed.2d 128, 143 (1976)); *Burr v. City of Cedar Rapids,* 286 N.W.2d 393, 394 (Iowa 1979); *Blanton v. Barrick,* 258 N.W.2d 306, 309 (Iowa 1977). Consistent with federal precedent, we have explained the reason for the rule in part as follows:

> "The common-law immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties. These include concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust."

*Blanton,* 258 N.W.2d at 309–10 (quoting *Imbler,* 424 U.S. at 422–23, 96 S.Ct. at 992–93, 47 L.Ed.2d at 139); *cf. Clinton v. Jones,* 520 U.S. 681, 693, 117 S.Ct. 1636, 1643, 137 L.Ed.2d 945, 960 (1997) ("In cases involving prosecutors, legislators, and judges we have repeatedly explained that the immunity serves the public interest in enabling such officials to perform their designated functions effectively without fear that a particular decision may give rise to personal liability."). While these quasi-judicial activities to which absolute immunity attaches may occur inside or outside the courtroom, "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Buckley v. Fitzsimmons,* 509 U.S. 259, 273, 113 S.Ct. 2606, 2615, 125 L.Ed.2d 209, 226 (1993). Thus, the immunity "is a function of the specific activities engaged in by a prosecutor, and does not attach simply by virtue of the civil defendant's status as a prosecutor." *Hike,* 427 N.W.2d at 159.

Because we apply a functional analysis, immunity attaches even when the prosecutor is alleged to have acted for improper reasons. *See id.* at 159 (criminal charges used as leverage in settlement negotiations for a client in an associated civil matter); *Burr,* 286 N.W.2d at 396 (maliciously filing a complaint without probable cause); *Blanton,* 258 N.W.2d at

311 (malicious institution of criminal proceedings against a man whose wife the prosecutor was representing in their divorce). Immunity, after all, is not for the protection of the prosecutor personally, but for the benefit of the public. *Cf. Imbler,* 424 U.S. at 418 n. 12, 96 S.Ct. at 989 n. 12, 47 L.Ed.2d at 136 n. 12 (explaining analogous rule for judges). Although genuinely wronged plaintiffs are left without recourse in a civil suit for damages, the alternative would disserve the broader public interest. *Id.* at 427, 96 S.Ct. at 993, 47 L.Ed.2d at 142. "It would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system." *Id.* at 427–28, 96 S.Ct. at 993–94, 47 L.Ed.2d at 142; *cf. Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949) (Hand, J.) ("As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done … than to subject those who try to do their duty to the constant dread of retaliation.").[2]

■ That said, the prosecutor "seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns v. Reed,* 500 U.S. 478, 486, 111 S.Ct. 1934, 1939, 114 L.Ed.2d 547, 558 (1991). "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Id.* at 486–87, 111 S.Ct. at 1939, 114 L.Ed.2d at 558. We will be sparing in our recognition of absolute immunity and will not extend it further than its justifica-

tion warrants. *Cf. id.* at 487, 111 S.Ct. at 1939, 114 L.Ed.2d at 558–59.

■ The decision to bring criminal charges is clearly "intimately associated with the judicial phase of the criminal process," and therefore the common law of Iowa affords prosecutors absolute immunity for deciding whether to do so. *Hike,* 427 N.W.2d at 159 (prosecutor immune for deferring charges); *Burr,* 286 N.W.2d at 396 (signing complaint and making requisite oath or affirmation); *Blanton,* 258 N.W.2d at 311 (initiating charges); *cf. Imbler,* 424 U.S. at 430–31, 96 S.Ct. at 995, 47 L.Ed.2d at 143–44 (initiating and pursuing criminal charges). Although we have not heretofore had occasion to decide the question, we also think this legal principle implies a correlative absolute immunity for a prosecutor's decision not to bring charges. This decision is consistent with the weight of authority. *See, e.g., Roe v. City & County of San Francisco,* 109 F.3d 578, 583 (9th Cir.1997); *Harrington v. Almy,* 977 F.2d 37, 40 (1st Cir.1992); *Schloss v. Bouse,* 876 F.2d 287, 290 (2d Cir.1989); *Dohaish v. Tooley,* 670 F.2d 934, 938 (10th Cir.1982); *see also Turack v. Guido,* 464 F.2d 535, 535 (3d Cir.1972); *Coon v. Froehlich,* 573 F.Supp. 918, 920–21 (S.D.Ohio 1983). The Ninth Circuit, for example, concluded with "little difficulty" prosecutors enjoyed absolute immunity for the decision not to prosecute cases in which a police officer was involved, because

> public policy considerations make an even stronger argument for absolute immunity for failure to prosecute than for actual prosecution. The decision to charge a defendant with a crime may well be the most critical determination

---

**2.** Prosecutors are not completely beyond reproach even when absolute immunity attaches. The doctrine does not foreclose professional discipline or criminal punishment.

*See Blanton v. Barrick,* 258 N.W.2d 306, 311 (Iowa 1977); *Imbler v. Pachtman,* 424 U.S. 409, 428–29, 96 S.Ct. 984, 994, 47 L.Ed.2d 128, 142–43 (1976).

in the entire prosecutorial process. That decision alone may result in the loss of a defendant's freedom pending trial and certainly will confront him or her with the economic and social costs of a trial. There can be no question that the nature of the decision not to prosecute is "intimately associated with the judicial phase of the criminal process."

*Roe,* 109 F.3d at 583. Similarly, the First Circuit concluded a prosecutor's decision not to pursue an officer's cases fell "squarely within the scope of [the] immunity.... [T]he interest that prosecutorial immunity is designed to protect—independence in the charging decision—is implicated whether the decision is to initiate a prosecution or decline to do so." *Harrington,* 977 F.2d at 40.

██ As these same courts have also recognized, the mere fact a prosecutor makes a decision with respect to a class of cases—present and future—as opposed to merely a present case is immaterial, and does not render the action "administrative" as opposed to "quasi-judicial," i.e., absolutely immune. *See id.* at 42 n. 3; *Roe,* 109 F.3d at 583–84. "[T]here is no meaningful distinction between a decision on prosecution in a single instance and decisions on prosecutions formulated as a policy for general application." *Roe,* 109 F.3d at 583 (citing *Haynesworth v. Miller,*

820 F.2d 1245, 1269 (D.C.Cir.1987)). In both instances, "the prosecutor's decision relates directly to the initiation of prosecutions .... [and t]he prosecutor is fulfilling his role as the officer in the judicial process charged with the responsibility of determining which prosecutions will best serve the public interest." *Harrington,* 977 F.2d at 42 n. 3.

██ For all the foregoing reasons it is manifest that Phillips is entitled to absolute immunity for the decision not to prosecute the class of cases in which Beck would appear as a witness. To hold otherwise would interfere in a prosecutor's exercise of independent judgment.[3] Such a ruling would thereby undermine one of the recognized policies which give rise to the immunity, insofar as "[a] prosecutor is duty bound to exercise his best judgment both in deciding which suits to bring and in conducting them in court."[4] *Burr,* 286 N.W.2d at 394 (quoting *Imbler,* 424 U.S. at 424, 96 S.Ct. at 992, 47 L.Ed.2d at 140). And under the asymmetrical immunity forged by that holding, the public trust would clearly suffer. *See Blanton,* 258 N.W.2d at 309–10.

██ Nonetheless, on the facts of this case we find the action about which Beck complains—Phillips's writing of the letters to the police department and the mayor, as opposed to his decision not to

---

**3.** The decision whether to call or not to call a given witness clearly falls within the scope of the immunity. *Mowbray v. Cameron County,* 274 F.3d 269, 276–77 (5th Cir.2001); *McNamara v. Hawks,* 354 F.Supp. 492, 495 (S.D.Fla.1973); *see Imbler,* 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33, 47 L.Ed.2d at 144 n. 33.

**4.** Beck also points to Phillips's statements that *Brady* and *Giglio* would require Phillips to disclose the DCI investigation in all criminal prosecutions involving Beck. Beck strenuously argues that Phillips's understanding of

these two cases is wrong. The immunity, however, protects the prosecutor's professional evaluation, not its soundness. "Whether [the prosecutor's] assessment is accurate or not is immaterial." *Roe v. City & County of San Francisco,* 109 F.3d 578, 584 (9th Cir. 1997). "The judgment may be wrongheaded, but it is the prosecutor's to make free from damage actions ... in ... court." *Harrington v. Almy,* 977 F.2d 37, 42 (1st Cir.1992). We express no opinion on the correctness of Phillips's understanding, as expressed in his letters, of his duties as a prosecutor to disclose evidence favorable to the accused.

prosecute—was not entitled to absolute immunity. In a number of cases, courts have held a prosecutor's mere act of advising police is not a function to which absolute immunity attaches. *See, e.g., Burns,* 500 U.S. at 492–96, 111 S.Ct. at 1942–45, 114 L.Ed.2d at 562–65 (prosecutor not entitled to absolute immunity when he advised police hypnosis was an acceptable investigative technique). Likewise, a prosecutor is not entitled to absolute immunity when performing an administrative function. *See, e.g., D'Iorio v. County of Delaware,* 447 F.Supp. 229, 235 (E.D.Pa.1978), *rev'd on other grounds,* 592 F.2d 681 (3d Cir.1978) (district attorney fired employee after receipt of pictures showing employee in the company of known criminals, for fear they would put office in compromising position; action fell outside prosecutor's absolute immunity and only qualified privilege was available). Determining what constitutes advice or administrative activity, as opposed to a quasi-judicial activity, is often difficult and will depend on the facts and circumstances of each case. *See Imbler,* 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33, 47 L.Ed.2d at 144 n. 33; *Prince v. Hicks,* 198 F.3d 607, 612 (6th Cir.1999). In this case, however, it strains reason too far to characterize Phillips's writing of his letters as an activity "intimately associated with the judicial phase of the criminal process." In writing these letters, Phillips was not deciding not to prosecute a case, but instead merely advising local law enforcement authorities on how future criminal prosecutions should be conducted and how his office would deal with those cases. Implicitly, Phillips was also performing an administrative function, insofar as he was telling lower-level law enforcement officers how to deal with a potential problem employee in light of his policy. Phillips was acting less as an advocate for the State, and more as the county's law enforcement officer, telling lower-level officials how fu-

ture prosecutions should be conducted. Indeed, Phillips closed his letters by exhorting each of Beck's supervisors to "govern yourself accordingly"—subtly but unmistakably advising them not only how to handle future cases, but also Beck's future employment.

■ Because we apply a functional test, Phillips is not entitled to absolute immunity simply because of his status as a prosecutor. *Hike,* 427 N.W.2d at 159. Phillips's letters did not, in themselves, "involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions." *Cf. Buckley,* 509 U.S. at 278, 113 S.Ct. at 2618, 125 L.Ed.2d at 229 (prosecutor not entitled to absolute immunity for holding a press conference announcing indictment of plaintiff). Although "[a]lmost any action by a prosecutor ... could be said to be in some way related to the ultimate decision whether to prosecute," absolute immunity is not that expansive. *See Burns,* 500 U.S. at 495, 111 S.Ct. at 1944, 114 L.Ed.2d at 564. Even if we were to assume that Phillips's actions were "an integral part of a prosecutor's job" or "serve[d] a vital public function," in so acting Phillips was in no different position than any other administrator. *Cf. Buckley,* 509 U.S. at 278, 113 S.Ct. at 2619, 125 L.Ed.2d at 229. For this reason we are convinced the doctrine of *qualified* immunity, which applies in these sorts of situations regardless of the defendant's status as a prosecutor, is sufficient to protect the public interests at stake. *Cf. id.*

We conclude Phillips has not met his burden in showing he was engaged in an activity intimately associated with the judicial phase of the criminal process when writing the letters to Beck's supervisors, and therefore is not entitled to absolute immunity. *See Burns,* 500 U.S. at 486, 111 S.Ct. at 1939, 114 L.Ed.2d at 558.

## B. Alternative Defenses

In his motion for summary judgment, Phillips lodged several alternative defenses, including (1) truth and (2) lack of a cause of action under the unlawful dissemination statute. The district court did not acknowledge these arguments and did not rule upon them. In his answer and a subsequent pleading, Phillips also claimed he was entitled to a qualified immunity, insofar as he made a good faith statement on an issue about which he had a duty. *See Buckley,* 509 U.S. at 273, 113 S.Ct. at 2616, 125 L.Ed.2d at 226 ("when a prosecutor 'functions as an administrator rather than as an officer of the court' he is entitled only to qualified immunity") (quoting *Imbler,* 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33, 47 L.Ed.2d at 144 n. 33). *See generally Barreca v. Nickolas,* 683 N.W.2d 111, 121 (Iowa 2004) (discussing qualified privilege in defamation cases and adopting *New York Times* definition of actual malice). On appeal, Phillips only reasserts the two arguments raised in his motion for summary judgment. We therefore do not decide whether Phillips is entitled to a qualified immunity.

As for Phillips's other defenses, in a number of cases we have upheld a district court ruling on an alternative ground, provided it was urged in that court. *DeVoss v. State,* 648 N.W.2d 56, 61 (Iowa 2002); *see, e.g., Interstate Power Co. v. Ins. Co. of N. Am.,* 603 N.W.2d 751, 756–58 (Iowa 1999); *Regent Ins. Co. v. Estes Co.,* 564 N.W.2d 846, 848–49 (Iowa 1997); *Krohn v. Judicial Magistrate Appointing Comm'n,* 239 N.W.2d 562, 563 (Iowa 1976). Our language in those cases clearly indicates, however, the decision to do so remains within our discretion. *See, e.g., DeVoss,* 648 N.W.2d at 62 (noting "we have used language to the effect that 'we *may* affirm the ruling on a proper ground urged but not relied upon by the trial court'" (emphasis added) (quoting *Krohn,* 239 N.W.2d at 563)); *Hawarden,* 589 N.W.2d at 252 ("we *may* affirm on any basis appearing in the record and urged by the prevailing party" (emphasis added, internal quotation omitted)). In this case, we think it is more appropriate to remand this case for further proceedings in the district court, where the arguments of the parties, as well as the record, can be more fully developed in light of our ruling.

## IV. Conclusion

We reverse and remand for further proceedings. Although Phillips, as county attorney, is entitled to absolute immunity for his decision not to prosecute cases in which Beck was involved, he was not engaged in an activity intimately associated with the judicial phase of the criminal process when writing letters to Beck's supervisors; instead, he was merely advising the relevant authorities on how future criminal prosecutions should be conducted. Summary judgment was not proper. We remand for further proceedings not inconsistent with this opinion.

**REVERSED AND REMANDED.**